LOUD *v.* FEDERAL INSURANCE CO.

1. COMPROMISE AND SETTLEMENT—FRAUD—MISTAKE.

   Compromise settlements are favored by the courts, and will not be set aside except on satisfactory evidence of mistake, fraud, or unconscionable advantage.

2. INSURANCE—MARINE INSURANCE—COMPROMISE AND SETTLEMENT —RESCISSION—LACHES.

   The Federal government, under a Federal statute, straightened a vessel, sunk in a narrow channel, so as to permit navigation, the expense of same being a charge against the vessel. The insurers contracted with a wrecking firm to raise the vessel and take it to port for a stipulated sum or one-half of the salved value, optional with the insurers. After the vessel was raised and in port the owner abandoned it to the underwriters as a constructive total loss. After some negotiations he entered into contract of settlement with the insurers, withdrawing the abandonment, and agreeing to pay the bills in connection with the wrecking of the vessel in consideration of the payment of a fixed sum by the insurers, which was considerably less than he was entitled to receive under the abandonment. After receiving a part of said consideration the owner had notice that the wrecking contractors claimed the insurers had elected to pay the stipulated sum, the salved value being in dispute. The owner received the balance of the payment, without attempting to disaffirm said settlement, and waited nearly two years and a half after all the facts were in his possession before attempting to rescind said compromise on the ground of fraud. *Held,* the owner was guilty of laches, and not entitled to rescind.

3. SAME—RESCISSION—STATU QUO—LACHES—EQUITY.

   Where the insurers could not be placed in *statu quo,* the owner having allowed the vessel to be sold under libel proceedings before attempting to rescind the settlement, his right to rescind was barred by laches.

4. SAME — PRINCIPAL AND AGENT — AGENT'S AUTHORITY — FRAUD —RESCISSION.

   As to whether the insurers had elected to pay the stipu-

lated sum instead of one-half of the salved value to the wrecking company, by its agent, and its representations to the owner in that regard, evidence *held*, insufficient to establish the agent's authority to make a binding election, or that material representation' was relied upon by the owner in making the settlement.

Appeal from Iosco; Connine and Widdis, JJ. Submitted October 20, 1916. (Docket No. 40.) Decided March 29, 1917. Rehearing denied June 1, 1917.

Bill by Henry Nelson Loud against the Federal Insurance Company and others to set aside a compromise of an insurance loss, to reinstate certain policies of insurance and other relief. From a decree for plaintiff, defendants appeal. Reversed.

*Goulder, White & Garry, A. W. Black,* and *Angell, Bodman & Turner,* for appellants.

*Lucking, Helfman, Lucking & Hanlon (Henry, Henry & Henry* and *Charles E. Kremer,* of counsel), for appellee.

STONE, J. The bill of complaint herein was filed to set aside a compromise of a marine insurance loss on the alleged ground of false representations and fraudulent concealment, to reinstate the written abandonment of the steamer in question to the underwriters as a constructive total loss, and to recover as damages the full amount of insurance.

On May 21, 1910, the plaintiff herein was the owner of a steamer known as the "J. B. Ketcham 2d." On that day, while on a voyage from Brimley, Mich., near Sault Ste. Marie, to Niagara Falls, N. Y., laden with a cargo of 730 cords of pulp wood, the steamer stranded and sank by reason of a dense fog, at the entrance to the West Neebish channel in the St. Mary's river.

The plaintiff was then the owner of various policies of hull insurance, issued and delivered to him by the several defendants in an aggregate amount of $48,500, on all of which the premiums had been paid. On margin of each policy in large type appeared the following:

"Any casualty to be immediately reported to R. Parry-Jones, Perry-Payne Building, Cleveland, Ohio."

At the time of the wreck, the plaintiff was also the owner of $9,000 of so-called disbursement insurance which was payable to the owner in the event of an actual or constructive total loss of the steamer. Some of the defendant companies which issued hull policies on the steamer also issued disbursement policies. Each disbursement policy contained this clause, viz.:

"A total and/or constructive total loss paid by insurers on hull, to be a total loss under this policy."

The hull policies in question stipulated that the agreed value of the boat was $48,500, and that in case of a wreck the boat might be abandoned to the underwriters as a constructive total loss, if the amount of the loss exceeded 75 per cent. of said $48,500, or $36,-375. It is the claim of the plaintiff that according to the conceded principles of marine insurance law, the amount of loss depended on what, in a high degree of probability, it would have cost to recover, salve, repair, and restore the boat to its condition prior to the accident, free and clear of all claims, burdens, and liens against it for recovery, restoration, salvage, and repair, etc.; that the high probabilities of such cost were those in contemplation at the time of the written abandonment of the wrecked boat by the owner to the insurance companies. The fraud complained of in the bill arose out of the claimed misrepresentations and concealment by the defendants of the amount of salv-

age claims to which the boat became subject by reason of the wreck, and while in possession of the underwriters; that as a result of such fraud, plaintiff had been induced to withdraw his abandonment of his steamer as a constructive total loss, to compromise his claims for total recovery for a smaller amount, and to assume certain salvage burdens to which the boat became subject by reason of the wreck.

The Ketcham was 212 feet long, and had a 40-foot beam. At the point where the boat sank, the channel was about 300 feet wide, and the boat lay lengthwise, at right angles across it, thus preventing navigation of the channel. The boat lay on a rock, and her deck was about 8 feet below the surface of the water. At the time of the wreck, C. M. Townsend, colonel of engineers, was stationed by the United States War Department at Detroit. His assistant, L. C. Sabin, was stationed at the Soo. Colonel Townsend, through Mr. Sabin, immediately took charge of the wreck, throwing the deckload overboard, and endeavoring to straighten the boat in the channel so as to permit navigation. Colonel Townsend acted under the provisions of section 20 of the United States river and harbor act, approved March 3, 1899 (U. S. Comp. Stat. 1913, § 9925). That section provided for the removal of boats which had sunk in navigable waters so as to block interstate commerce. It gave the Secretary of War, or his agent, the right to take possession of the wreck, and remove it from the channel. The act stipulated "that the expense of the removal of any such obstruction as aforesaid shall be a charge against such craft and cargo," and also provided that if the owner failed to reimburse the United States within 30 days after notice, the officer or agent of the United States might sell the craft or cargo, or any part thereof not destroyed in removal, and cover the proceeds thereof into the treasury of the United States.

Mr. Sabin ordered three tugs of the Great Lakes Towing Company to the wreck. These tugs tried to pull the boat straight in the channel, but failed to do so. Thereupon Colonel Townsend ordered the Reid Wrecking Company, Limited, of Sarnia, Ontario, to straighten the boat in the channel. That company sent four tugs and four pontoons with apparatus, divers, and crew, etc. They arrived at the wreck on May 24, 1910. The current at the place of the wreck was six miles or better an hour. The effect, of the 212-foot boat stranded across the 300-foot channel, was to increase the current. During the operations there were stiff northwesterly winds and gales which increased the current from 100 to 125 per cent., and at times knocking down the divers. It is the claim of the plaintiff that it was necessary to swing the boat around and straighten it in the channel in order to raise it; that during the operations the Reid Wrecking Company had in mind the ultimate raising and salvage of the boat. The men worked day and night, and finally, on June 4, 1910, the boat was swung straight in the channel. The bill of the Reid Wrecking Company, hereinafter referred to as the government bill was $18,459. During the subsequent negotiations for a compromise, this government bill was in dispute. Mr. Goulder, attorney for defendants, claimed that section 20 of the United States act, above referred to, was unconstitutional, which Mr. Oakes, attorney for plaintiff denied. Mr. Goulder, however, conceded that a portion of $18,459 expended in straightening the boat in the channel would have been incurred necessarily in straightening and raising the boat in the channel to take it to port. Upon the hearing Mr. Oakes testified that Mr. Goulder conceded $10,000 in this manner. Mr. Goulder testified that $8,000 were his figures. Mr. Oakes testified that in the negotiations he stated that he was prepared to show that between $12,000 and

$16,000 was a proper charge, even if the law were unconstitutional.

On June 4, 1910, and after the completion of the government job, the defendants (through R. Parry-Jones, their agent duly authorized so to do) made a contract with the Reid Wrecking Company to salve the boat and take it to its destination, Tonawanda, N. Y., upon the terms expressed in the following communication:

"CLEVELAND, OHIO, June 4/10.
"REID WRECKING CO.,
    "Port Huron, Mich.
"Ketcham. We accept your offer to salve Ketcham and cargo now in vessel and deliver at destination for $12,000, or 50% of salved value at underwriter's option, no cure no pay, you clearing channel of wreckage to satisfaction of local authorities.
                    "R. PARRY-JONES."

Mr. Oakes testified:

"By the Reid contract of 'no cure no pay,' etc., is meant that the ship would have to be raised and delivered, otherwise the wrecker would receive no compensation, and if delivered, the insurers had the option as to whether they would pay $12,000 or 50 per cent. of the salved value."

The Reid Wrecking Company brought the boat to Port Huron, Mich., and then with the knowledge of R. Parry-Jones removed it to Sarnia. It was in evidence that the removal to Sarnia was not mentioned by the Reids to the Louds. About June 25, 1910, while the boat was at Port Huron, it was examined by Charles E. Benham, surveyor of the plaintiff, and John T. Webster, as surveyor for the defendants. Benham reported the cost of repairs at $14,743.25, and Webster at $10,000. On June 28, 1910, when the boat was at the port of Port Huron, the plaintiff owner abandoned in writing the Ketcham to the defendants.

On June 30, 1910, the plaintiff supplemented the abandonment by proofs of loss served on the companies. The plaintiff set forth in the proofs of loss that the claims outstanding against the boat were wrecker's bills of $30,459, an estimate of probable cost of repairing said vessel at "upwards of $14,000," and expenses of the owner in traveling in and about saving the vessel over $1,000.

The defendants denied that there were grounds for abandonment as a constructive total loss; that is, they denied that it was in a high degree probable that the cost of restoration, recovery, salvage, and repair, etc., would exceed $36,375. Thereupon, in the fall of 1910, negotiations for a settlement took place between the parties. The plaintiff had placed his affairs in the hands of the law firm of which Mr. Oakes was a member, and negotiations were handled by Mr. Oakes, his client and the latter's brother. Mr. Goulder and Mr. Ashley acted for the defendants, aided by information from R. Parry-Jones, when asked for. These negotiations finally culminated in a conference on Octomer 28, 1910, at Mr. Goulder's office in Cleveland, at which were present the plaintiff, his brother, Edward F. Loud, and Mr. Oakes, their attorney, on the one side, and Mr. Goulder and Mr. Ashley, representing the underwriters, on the other. It appears that Mr. Parry-Jones was not present at this meeting, and it is claimed by defendants that he had no part at all in negotiating settlement, or in recommending settlement to the underwriters. In fact it is claimed that the authority of Mr. Goulder and Mr. Ashley was limited, and that they could not close the settlement, but could make recommendations only. After making some figures, the exact import of which are in dispute, Mr. Goulder and Mr. Ashley said they would recommend $35,000 to be paid by the underwriters. In that connection the following letter is pertinent:

"DETROIT, MICH., Nov. 1, 1910.
"HARVEY D. GOULDER, ESQ.,
   "Rockefeller Bl'dg.,
    "Cleveland, Ohio.
*"Dear Sir:*

"Supplementing conferences Mr. Loud and ourselves had with yourself and Mr. Ashley, the owners of the Ketcham have finally concluded, if prompt settlement can be had, to accept the figures which Mr. Ashley and yourself say that you will recommend to the underwriters, namely, a payment to the owners of a lump sum of $35,000, the owners of the Ketcham to take care of the sundry bills connected with the raising, wrecking and repairing of the steamer, and to assume the burden of disposing of the government claim against the steamer in connection with the moving and raising of the steamer from the bottom of St. Mary's river. This suggested settlement to close the matter; in other words, so far as the liability of the Ketcham underwriters to owners or others on account of this disaster is concerned. Of course, this is all made without prejudice to our claim for constructive total loss, and will only be considered, as we talked, on the basis of payment being made by all the hull underwriters promptly on the above basis. The owners feel that this is a material concession from the amount they think they are entitled to, but have concluded, as stated, to accept this on the basis of prompt payment. Trusting you will expedite the submitting of this, and the replies from the underwriters, and awaiting your further advices, we remain
    "Yours very truly,
      "SHAW, WARREN, CADY & OAKES."

Whether the question of the election to pay $12,000, or 50 per cent. of the salved value, was discussed at the October meeting is in dispute. Mr. Oakes testified that Parry-Jones, in his Cleveland office, told him (Oakes) on two occasions "that there had been no election; he said it was still open to them to accept— to pay $12,000, or 50 per cent. as they may desire." Parry-Jones admitted making such statements. It is the claim of the plaintiff that the boat then in its

wrecked condition and almost at the close of the navigation season was not worth to˙exceed $12,000; and that the difference involved in the alternative of paying $12,000, or 50 per cent. of the salved value, amounted to about $6,000. Upon this subject Mr. Oakes testified at the hearing:

"It was a very vital point; in fact it meant, with the $12,000 in there, there would be enough to safely make our total loss, or constructive loss absolute; if we were limited to 50 per cent. of the salved value our total could well have been honestly in the 75 per cent. limit. In other words, our constructive total loss would never have been abandoned — we never would have thought of a compromise with the $12,000 item there absolute."

On November 28, 1910, a settlement was made between the parties whereby the defendant companies agreed to pay the plaintiff $35,000, and the plaintiff agreed to withdraw its abandonment, and take care of the sundry bills connected with the wrecking of the steamer, and assume the burden of disposing of the government claim, and to hold the defendants harmless on the Reid salvage contract. Shortly thereafter payments were commenced, and were made as follows:

| | | |
|---|---|---:|
| Dec. 3, 1910 | Commercial Union .......... | $1,757 65 |
| Dec. 14, 1910 | Federal ................... | 5,272 95 |
| Dec. 14, 1910 | Yang-tsze ................ | 1,757 65 |
| Dec. 14, 1910 | Firemen's Fund ............ | 878 77 |
| Dec. 14, 1910 | Mannheim Ins. Co. ........ | 2,109 05 |
| Dec. 14, 1910 | Union Marine ....˙........ | 3,163 59 |
| Jan. 13, 1911 | Lloyd's, London ........... | 9,655 11 |
| Jan. 13, 1911 | Indemnity Mutual ......... | 3,522 55 |
| Jan. 13, 1911 | Merchant's Marine ....˙.... | 2,641 19 |
| March 4, 1911 | Great Lakes .............. | 1,757 65 |
| March 4, 1911 | Atlantic Mutual ........... | 2,636 84 |
| Total | ............................ | $35,153 00 |

These payments were made through insurance brokers Willcox, Peck & Hughes, who, it appeared, de-

sired some evidence of a complete settlement, and so asked the plaintiff to put in the form of a letter the terms of the settlement.    This the plaintiff did as follows:

"DETROIT, MICH., Jan. 12, 1911.
"MESSRS. WILLCOX, PECK & HUGHES,
   "Ins. Brokers,
      "Fidelity Building,
         "Buffalo, N. Y.
*"Gentlemen:*
   "In accordance with your recent request we write you the following letter, the purpose of the same being to put in written form my agreement to hold the underwriters herein named free from any liability under the contract made by underwriter's representative with the Reid Wrecking Company in connection with the raising and delivery of the steamer J. B. Ketcham II. on account of disaster of May 21, 1910.   This will acknowledge receipt from you of checks on account of the companies named below, on account of the above loss, the same having opposite the amounts paid for each company, such amount being in full of that particular company's share of loss: (Listing payments that had been made.)    My undertaking herein contemplates that I will save the underwriters harmless from all proper charges and claims of the Reid Wrecking Company, Ltd., under the contract which the underwriter's representative has stated was made with them on the basis of a maximum payment of $12,000.   You may hold this letter, if you desire, for the benefit of the underwriters named herein.   We trust this will answer your purpose.         Yours very truly,
            "HENRY NELSON LOUD,
         "Owner Stmr. John B. Ketcham II."

Later, and on February 23, 1911, a bond of indemnity was given to defendants by plaintiff.   In the meantime, and on December 6, 1910, the Reid Wrecking Company filed a libel and caused writ to issue against the steamer in question in the exchequer court of Canada for the Toronto admiralty district, claiming $12,000 under the salvage contract.   The

plaintiff appeared in said admiralty case, and in its statement of defense appear the following:

"The plaintiff company (the Reid Wrecking Company, Ltd.) and the defendant (the plaintiff here) entered into a verbal agreement whereby the plaintiff company agreed to take the ship in payment of all their claims, and to transfer to the owner the amount which they were entitled to receive from the Lake Carriers' Association or the government of the United States of America, which amount was upwards of $18,000. Acting on the strength of the said agreement the defendant settled with the underwriters his claim against them under the policies of insurance covering the said ship, and notified the plaintiff company that he was ready and willing to carry out the said agreement, but the plaintiff repudiated the said agreement, and refused to carry it out, and claimed to be entitled to recover against the ship under the said R. Parry-Jones contract, and the said contract referred to in the third paragraph hereof. * * * The said R. Parry-Jones had no authority to elect to pay the plaintiff's claim for salvage at $12,000 under the said contract, and even if he had such authority, he did not elect to pay the plaintiff's claim at such amount."

Upon learning of the libel, and that the Reid Company was claiming $12,000, Mr. Oakes went to Cleveland and saw R. Parry-Jones on December 14, 1910, and the latter called his attention to a letter which he (R. Parry-Jones) had written to the Reid Wrecking Company on September 17, 1910, which contained the following language:

"Regarding your query as to what the underwriters intend doing regarding your bill, of course the contract bill of $12,000 will be paid by them as soon as the matter has become more adjusted. The other bill as you know is under consideration, and we trust will be assumed by the government authorities and the underwriters jointly, when it has been modified as desired; but as stated in my letter to you this morning, we are awaiting a letter from you on the subject,

and no further step can be made until we hear from you."

R. Parry-Jones also sent a copy of the above letter to Mr. Oakes on December 14, 1910, writing Mr. Oakes as follows:

"Herewith copy of my letter of September 17, 1910, to the Reid Wrecking Company, which, as far as I can find, is the only letter in which I state that the underwriters will pay the contract price of $12,000 for raising and delivering the vessel. I may add, however, that in none of my letters have I ever used an expression stating that I had elected, or that the underwriters had elected, to pay the $12,000 in preference to the 50 per cent. of value received."

Mr. Oakes testified that owing to absence from home he did not receive this letter until December 22, 1910. At this time upwards of $14,000 had been paid plaintiff on the compromise. The boat was sold February 24, 1911, at Sarnia, on the libel, in advance of the hearing, for $12,650 to the Reid Wrecking Company. All of the parties hereto knew of the sale in advance thereof. On the trial of the Reid libel action in May, 1911, R. Parry-Jones testified that it was his intention by his letter of September 17, 1910, to the Reid Wrecking Company to exercise the option at $12,000. On June 9, 1911, the Toronto admiralty court found that an election had been made.

In September, 1913, suit was brought by the United States against this plaintiff on the $18,000 claim, and is still pending. The instant case was begun on October 15, 1913. The grounds of defense will be stated later. A decree was granted to the plaintiff at the circuit, and the defendants have appealed. The legal points discussed by plaintiff are:

(1) That equity has jurisdiction to set aside a compromise obtained by fraud, and will retain jurisdiction to adjudicate all the rights of the parties.

(2) That in equity, an actual design to mislead is not necessary, if a party is actually misled by another into a bargain.

(3) That a compromise will be set aside for false representations, or fraudulent concealment by a court of equity.

(4) That the right of abandonment in this case did not depend on the certainty, but upon the high probability that the loss ·would exceed 75 per cent. of the agreed value of the boat, which constituted it a constructive total loss.

(5) That if the court should set aside the compromise, then the plaintiff is entitled to recover as and for an actual total loss (as distinguished from a constructive total loss), since the boat was sold to pay a salvage lien, for a sum less than enough to pay all the expenses of recovering and repairing the boat.

(6) That as matter of law, the total government claim of $18,459 was a proper item of expense to be considered in determining the amount of loss, and there was a constructive total loss.

(7) The defendants can 'be placed substantially in *statu quo*.

(8) That the decision of the exchequer court of Canada holding that the defendants had elected, prior to the compromise, to pay $12,000 to the Reid Wrecking Company, and not to pay 50 per cent. of the salvage value is *res adjudicata*.

(9) That the question of laches depends upon the facts of each particular case, upon the reasons for and the reasonableness of the delay, and upon the injury, if any, caused by the delay.

(10) That the amount realized from the sale of the boat is evidence of the value thereof.

It is the claim of the defendants upon this record:

(1) That the plaintiff was guilty of such laches as to take away any right of recovery.

(2) That the parties cannot be restored to *statu quo*.

(3) That there was no election of the underwriters, under the salvage contract, before the settlement between the Louds and underwriters in the latter part of October, 1910.

(4) The Louds did not rely upon any representations made to them respecting the election, and nothing was concealed from them that affected the settlement.

(5) That the Louds concluded the settlement with the underwriters on account of an arrangement they had made with the Reids, of which neither the underwriters nor any of their representatives had any knowledge.

(6) That the salved value of the Ketcham at the time of the claimed abandonment, and at the time of the compromise settlement, exceeded $24,000, so it is immaterial whether there had been an election or not.

The other claims of the defendants we shall not discuss.

It is unnecessary to refer to cases to support the proposition that settlements of controversies between parties by way of compromise, without litigation, are favored, and will not be set aside by courts except on satisfactory evidence of mistake, fraud, or unconscionable advantage. Were we to concede every proposition of the plaintiff, save the seventh, it seems to us that there are several insuperable objections to the granting of relief in this case.

1. The plaintiff was guilty of such laches and delay before suit as to take away any right of recovery. As a necessary allegation of the bill, and without which it would have been demurrable, it was stated:

"That as soon as your orator learned of the election as aforesaid, your orator disaffirmed said compromise, and the defendants were notified through their agent and attorney aforesaid of the disaffirmance by your orator; that negotiations were conducted to settle the difference between the said parties, and the intervening time consumed in said negotiations and the submission of briefs on the facts," etc.

These allegations were denied, and in our opinion were wholly unsupported by the evidence. We have been unable to find any testimony that any person authorized to accept a notice of disaffirmance in behalf

of any of the defendants was ever given any notice at all, until the filing of the bill of complaint in October, 1913. It does appear that in the spring of 1913, about two years after the plaintiff had all the information he ever had on the subject, one Fred Meyer of Buffalo, N. Y., of the brokerage firm that had the insurance on the Ketcham's cargo, but no connection at all with the insurance involved in this case, at the request of the brother of plaintiff, asked Parry-Jones' opinion, and was advised that he could make no recommendation, and of this the brother of plaintiff was advised in April, 1913, but even then nothing was done by way of disaffirmance, or giving notice thereof. Reference is made in plaintiff's brief to *Fred Macey Co. v. Macey,* 143 Mich. 138 (106 N. W. 722, 5 L. R. A. [N. S.] 1036). There this court said:

"Where a corporation protested promptly upon learning of a fraudulent contract made by its promoters, and entered into negotiations for peaceable settlement, which failed, a bill for cancellation, filed within a reasonable time after such failure, is not barred by laches."

We adhere to that doctrine. In the instant case the aggrieved party made no protest from December, 1910, to October, 1913, and indeed never protested before filing his bill of complaint. If the contract of compromise had been rescinded promptly, there were several things that the underwriters might have done. In the event of rescission before the boat was sold, they might, if they had so chosen, have paid the Reids the $12,000, and thus canceled the one contract. They might have done something the same as the plaintiff said he tried to do; that is, made some adjustment with the Reids by which both the government claim of $18,000, and the other contract of $12,000, should be settled, and some disposition made of the ship. It is doubtful in the light of this record whether they

would have contested the question that the Reids were entitled to at least $12,000, for, under the evidence as to the salved value of the Ketcham, it may well be said. that the $12,000 settlement was the best that could be made, as that salved value exceeded $24,000.

The Ketcham had been insured under hull policies to the full extent allowed on tonnage basis, $48,500. As testified to by plaintiff, not considering that sum to be full insurance on what the owner deemed the value of the ship, and in order that she might be insured for full actual value, he secured $9,000 additional "disbursement" insurance, payable only in the event of the hull insurers paying for a total, or constructive total loss. Here is a value of $57,500. The important question is, what was the boat worth before and just after the disaster, and not what she brought at a forced sale, in a foreign jurisdiction, incumbered with $30,000 of liens. We have set out the dates when payments were made under the settlement. The plaintiff and his attorney, after receiving a copy of Parry-Jones' letter of September 17, 1910, if they considered such letter to be an election, and were not satisfied with it, should have promptly disaffirmed the settlement and declined to receive further payments. More than one-half of the $35,000 was paid after full knowledge of this letter. Manifestly, and concededly, full knowledge of the so-called fraud was acquired at the trial in Toronto in May, 1911, and yet there was a delay of nearly 2½ years before attempted disaffirmance.

It was held in *Hubbardston Lumber Co.* v. *Bates,* 31 Mich. 158, that the delay of plaintiff therein, in asserting his right to rescind for 12 months, was laches on his part, and barred his right of recovery; the doctrine being stated that one who elected to disaffirm a contract must do so with all reasonable promptness, and cannot make any unnecessary delay

in making the election. See, also, *Wilbur* v. *Flood*, 16 Mich. 40 (93 Am. Dec. 203) ; *Lewless* v. *Railway Co.,* 65 Mich. 292 (32 N. W. 790) ; *Foster* v. *Rowley*, 110 Mich. 63 (67 N. W. 1077) ; *Olson* v. *Williams*, 185 Mich. 294, 301 (151 N. W. 1043) ; *Linderman Machine Co.* v. *Shaw-Walker Co.*, 187 Mich. 28, 36 (153 N. W. 34) ; *Grymes* v. *Sanders*, 93 U. S. 55; 2 Pomeroy's Equity Jurisprudence (3d Ed.), §§ 817, 965; 2 Black on Rescission and Cancellation, § 536.

2. What we have already said bears upon the proposition that the parties cannot be restored to *statu quo*. To reinstate the abandonment it is a prerequisite that the underwriters have whatever advantage there might be obtained from the transfer to them of the vessel. When the compromise settlement was made the ship had a value, and in our opinion the evidence shows that the value exceeded $24,000. Instead of bonding the ship, the plaintiff allowed it to be sold. Upon this branch of the case see *Kimble* v. *Gillard*, 177 Mich. 250-259 (143 N. W. 79) ; also the earlier cases of *Jewett* v. *Petit*, 4 Mich. 508 ; *Crippen* v. *Hope*, 38 Mich. 344; *Galvin* v. *O'Brien*, 96 Mich. 483 (56 N. W. 85) ; *Hinchman* v. *Motor Car Co.*, 151 Mich. 214 (115 N. W. 48).

In conclusion, it should be said that this record fails to show that Parry-Jones had any authority to make an election binding upon the underwriters. *Gore* v. *Assurance Co.*, 119 Mich. 136 (77 N. W. 650). Nor does it appear that he made any material representation that was relied upon by the plaintiff in the settlement.

It is unnecessary to discuss further claims or questions. The decree below will be reversed, and the bill of complaint dismissed, with costs to the appellants.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., took no part in this decision.

PER CURIAM.   In denying the motion for a rehearing, it may be stated that it has been suggested that the opinion of the court imputes to counsel laches in not disaffirming settlement as early as December, 1910. It is proper to state that no such construction was intended by the court, as the circumstances upon which the rescission suit was here based did not arise until May or June, 1911, several months after former counsel's connection with the case had ceased.