## GORE v. CANADA LIFE ASSURANCE CO.[1]

1. PRINCIPAL AND AGENT—AUTHORITY—EVIDENCE.
    A person's authority to contract on behalf of another cannot be proved by his own declarations, or by the mere fact that he assumes to enter into the contract.

2. SAME—INSURANCE—PRESUMPTIONS.
    It will not be presumed, because one is inspector or superintendent of agencies for a life-insurance company, that he has authority to bind the company by appointing agents and making contracts with them on its behalf.

3. SAME.
    Nor will it be presumed that the manager of a State branch of the company, having charge of the business brought to the office by the various subagents in the State, and transmitting the same to the company, possesses any such authority.

4. SAME—COMMISSIONS.
    Whether an insurance agent is entitled to his commission only when he obtains and presents an acceptable application depends upon the nature of his contract with the company.

Error to Wayne; Frazer, J. Submitted November 23, 1898. Decided December 28, 1898.

---

[1] Rehearing denied May 23, 1899.

*Assumpsit* by Henry H. Gore against the Canada Life Assurance Company for agent's commissions. From a judgment for plaintiff, defendant brings error. Reversed.

*Russel & Campbell,* for appellant.

*Maybury & Lucking,* for appellee.

HOOKER, J.    The plaintiff brought an action against the defendant, and recovered a judgment, for a balance claimed to be due him for commissions upon insurance premiums obtained from policies written for defendant's patrons upon his solicitation. The defendant has brought the case to this court by writ of error.

At the threshold of the case is the question whether the plaintiff sustained contract relations with the defendant. His claim is that he was employed on behalf of the defendant by one Glass, with the subsequent approval of Bucknell, who was called the "manager of the Michigan branch." The defendant asserts that it made a contract with some men named Cox, living in Toronto, Ontario, by which they had control of its business in Michigan and some other States, upon a commission of 50 per cent. upon new business, they to employ and pay their own subordinates; and that they established a branch office for Michigan, which they maintained under the charge of Bucknell, who was called "manager of the Michigan branch of the Canada Life Assurance Company," who was paid by a share of the commission on Michigan business and an allowance made by the Coxes. It is claimed that Glass was engaged by them upon similar terms; that he was designated "inspector of agencies;" that he was not authorized to employ any agents for the company, but was at liberty to divide his own commissions, as he pleased, with any whom he should see fit to engage to help him.

Thomas Donnelly, a witness called by the plaintiff, testified as follows:

"I am secretary of the Michigan branch of defendant, and was previously general manager for Michigan. Geo.

A. and E. W. Cox are general agents for Eastern Canada, and also have charge of Michigan. They are over Mr. Bucknell, superior to him."

On cross-examination he said:

"I am the direct representative of the Canada Life Assurance Company here. The Michigan business is managed by Mr. Bucknell, who is under Mr. Geo. A. Cox and Mr. E. W. Cox, who are general agents, having the territory of part of Ontario and Michigan. They have entire charge of the soliciting and placing of insurance until it is presented to the company for acceptance. The appointment of agents is subject to their approval. All agents are not appointed by them; some are appointed by the manager. The company allows to Messrs. Cox, the agents of territory, a percentage for all business that is transacted, and Cox appoints agents and carries on the business, and pays all the expenses of that business out of the fund that is coming to him. The commissions of Michigan come out of the commissions allowed by the head office; that is, allowed to Mr. Cox. I know of the arrangements from having charge of the books of the company here, and I know how the business is conducted. That is all I do know. I do not know whether the arrangement with Mr. Cox is in writing or not.   *   *   * The head office pays Mr. Cox 50 per cent. on first year's business and 7½ per cent. on renewals. Geo. A. and E. W. Cox select the manager for Michigan, and recommend the appointment to the head office. His salary comes direct from Cox out of the commissions. He is paid a salary and commissions.   *   *   *

"Q. Who pays Glass?

"A. Well, Cox. Of course it comes out of the commissions of this branch,—commissions and allowance that is made to the branch for expenses of the branch. If there is any profit, it goes to the Coxes; if a loss, they bear it. Mr. Glass had a number of agents; Mr. Bucknell had some agents of his own,—what we call subagents, more particularly. Those agents make their contract with the subagents. The agent receives a certain proportion of the commission, and it is true that he can make such arrangements with the subagents as he sees fit, by way of dividing the commission. The extent of authority of an agent to make a contract with a subagent is to make a contract to divide whatever commissions may be obtained from the insurance from the company between them."

Bucknell, who is said to be next in authority to the Coxes, was a witness for the defendant. He said that he was agent for the Canada Life Assurance Company, manager of the Michigan branch, and had been connected with the company for 17 years; that he had been manager of such branch since March 1, 1893, under Geo. A. and E. W. Cox, "who are the general managers for Eastern Ontario and the United States departments." He said further:

" I have no contract of employment with the defendant. My contract was made with Geo. A. and E. W. Cox, and always has been. It is in writing. I cannot produce it. It is by letter, and I could have produced it had I been asked for it. I would be willing to swear to the written agreement, and it can be verified by Geo. A. and E. W. Cox."

We have in this testimony the statement by one of the defendant's witnesses that the Coxes were general managers of the company, and this is not contradicted.

The next lower in authority appears to have been Mr. Glass. He testified as follows:

" When I came to Detroit, and began the business of soliciting insurance for the Canada Life, I made my contract or arrangement with Mr. G. A. Cox and E. W. Cox, of Toronto. My whole dealings were with them. My arrangements were exclusively with Mr. Cox. I never wrote to the company but once in my life, and then they turned me down, and referred me to Mr. Bucknell, who was under Mr. Cox. All of my dealings were in connection with the general agent of the territory of Detroit, or Michigan, and Ontario. I had a peculiar arrangement in this way: That Mr. Cox gave me the exclusive right to the south half of the State, with the right to appoint my own subagents. My arrangement was in writing. The contract is with my furniture, which is stored. I have no way of getting at it."

From the foregoing we think it evident that the arrangement made with the Coxes, and through them with others, did not contemplate authority to pledge the credit of the company in the employment of agents, and that neither

Cox nor Bucknell understood that he had such authority. Glass, who was employed as superintendent or inspector of agencies, or, as he says, given exclusive right to work the south half of Michigan, had no greater authority. We think, therefore, that the plaintiff's claim must fall, unless it can be said, that he had a legal right to understand that he was to look to the defendant for his pay by reason of its holding out Bucknell and Glass as its agents with authority to bind it in such matters.

The plaintiff, Gore, testified that he entered the employment of the defendant upon terms made by Mr. Glass, whose position was inspector of agencies. On being asked to state his arrangement with Mr. Glass, he said:

"Mr. Glass, when I first arranged with him, told me that 40 per cent. was the amount paid all agents. I was to solicit insurance, and whenever it was necessary I was to call upon him to go with me, to assist in closing up any insurance I might get in process of working. I was to work in Detroit. He told me a written contract was not necessary."

On cross-examination he said:

"I did not know anything about his arrangement with the company except such as he had told me. It was later that I made a contract with him, and then I came to Detroit. The day I reached Detroit I talked it over with Mr. Glass. We talked it over. I did not make any definite arrangement that day. I said I would see, and let him know later on. The next day I had another talk, when I made the final arrangement, and decided to go to work for the company. The arrangement was that I was to have 40 per cent. of the first year's premiums. It was not in writing. A few days after, I asked him if it was not better to have it in writing, and he said it was not necessary. Then my arrangement was that the company was to pay me 40 per cent. of the first year's premiums of all insurance that I had. He said he was the authorized agent of the company, and I was to work for the Canada Life, and I could advertise as such. He said he was the agent of the Canada Life Company, and that he would employ me for the company, and the company would pay me 40 per cent. of the first year's premiums of any insur-

ance I procured, but I was to have no renewal premiums.
That was the agreement that was made between Mr.
Glass and me.  *  *  *  I was working under Glass;
that is, I was working for the company under his instruc-
tions.  *  *  *  I was not under Bucknell until Mr. Glass
left.  *  *  *

"*Q.* As late as May, 1894, you were with Glass, and
not with Bucknell,—your arrangement was with Glass?

"*A.* As long as Glass was there, I was with him. It
was as late as May anyway, and I. think quite a little
after that.  *  *  *  I was not under Bucknell until Glass
left."

There are two theories upon which the plaintiff might
recover his compensation from the company: *First*, that
Glass actually had authority to make a contract that it
should pay him; and, *second*, that the company's conduct
was such as to justify his belief that Glass had such
authority, though in fact he was not authorized to do so.
Under the uncontradicted testimony, we must say that
the company never authorized Glass to make such a con-
tract.  If the plaintiff is to recover, it must be by reason
of a holding out by the company of Glass as having such
authority.  To sustain this theory, the agreement of Glass
has no force.  It was admissible for the single purpose of
showing the plaintiff's understanding upon the subject,
but it was no direct evidence of authority.

"Persons dealing with an agent must ascertain his
authority.  In approaching the consideration of the in-
quiry whether an assumed authority exists in a given
case, there are certain fundamental principles which must
not be lost sight of.  Among these are, as has been seen,
that the law indulges in no bare presumptions that an
agency exists; it must be proved or presumed from facts;
that the agent cannot establish his own authority, either
by his representations or by assuming to exercise it; that
an authority cannot be established by mere rumor or gen-
eral reputation; that even a general authority is not an
unlimited one; and that every authority must find its
ultimate source in some act of the principal.  Persons
dealing with an assumed agent, therefore, whether the
assumed agency be a general or a special one, are bound

at their peril to ascertain not only the fact of the agency, but the extent of the authority; and, in case either is controverted, the burden of proof is upon them to establish it." Mechem, Ag. § 276.

There was nothing in Glass' relation to the company which gave the plaintiff to understand that he had such authority. Glass says that he was an inspector of agencies. Plaintiff's counsel say that he was superintendent of agencies. There is nothing in the testimony to show that an inspector or superintendent of agencies was given such authority, and there is no such legal presumption. If, as the word imports, his business was to superintend or inspect the work of agents, it does not imply the right to appoint agents, and make contracts with them upon behalf of the company. So that, at the time Gore made the contract with Glass, he had no right to assume that Glass had such authority from anything except the statements and acts of Glass.

It may be said that Bucknell stated to Gore that Glass had authority to make the contract. Gore's testimony upon that subject is as follows:

"I asked Mr. Bucknell if the arrangement made with Mr. Glass was as though it was made with him, and if Mr. Glass had authority to act in that capacity, and he told me he had. * * * I asked Mr. Bucknell if it was necessary to have a written contract with Mr. Glass, and he said it was not. He said he was authorized to act for the company just the same as he was. I told him that, if it was necessary, I wanted a contract; and Mr. Glass told me it was not necessary, and Mr. Bucknell himself told me it was not necessary. I do not know anything about the private arrangement between Bucknell and the Canada Life Assurance Company."

It does not appear that Bucknell was told that Glass had attempted to contract that the company should pay Gore his commissions, and, if it did, any opinion he might have given, and any statement he might have made, concerning it, would not bind the company, unless he in turn either had, or was held out by the company as having,

authority to bind it by such statements.  The evidence
shows clearly enough that he was acting under a contract
made with the Coxes, and there is no evidence that he
was authorized to bind the company.  He testified that
he was not authorized to do so.

The claim is made that Bucknell was held out as a gen-
eral agent, and therefore that Gore had a right to assume
that he was authorized to employ him, or ratify the act of
Glass.  Bucknell had charge of the Michigan branch or
office for Cox, who had a contract to work the territory.
The Coxes were the ones who were held out as general
agents, if there were any general agents, and we do not
find anything showing that Bucknell was a general agent
of the company.  Gore himself testified that he did not
know what his arrangement was.  There is nothing to
show that he was misinformed by the company, or that
he even tried to ascertain.  He may, perhaps, have known
that the circulars of the company contained his name as
manager of the Michigan branch, but that is all.  We do
not intend that it shall be understood that we are of the
opinion that a general agency, so called, necessarily car-
ries with it the authority to appoint special agents for the
company.  Manifestly, any agency, general or special, is
no more than the principal chooses to make it, unless he
undertakes to limit the effect of the power which others
have a right to suppose he has conferred, when he will be
estopped to deny such power.

We are aware that the case of *Equitable Life As-
surance Co.* v. *Brobst,* 18 Neb. 526, is authority for
the proposition that, where the company conceded that
one Craine was the agent for all of its business for the
Northwest, the company would be bound by his employ-
ment of an agent, notwithstanding a private understand-
ing that payment of all agents appointed was to be made
by the agent.  There the general authority to appoint is
apparent.  But here we have no employment by a general
agent, nor by any one held out or advertised as such.
Bucknell was advertised as manager of the Michigan

branch, and neither Glass nor Bucknell, nor even the Coxes themselves, had authority to issue a policy, but merely to obtain and submit applications to the head office, as the witnesses call it, of the company. The true test, after all, is not a real or imaginary distinction between the general or special agents. It is a question whether the agent, general or special, as the case may be, has acted within the apparent scope of the authority confided. In the Nebraska case cited, the holding of the court was based on the fact that the agent was authorized to transact all of the business of the company, not because he was called a general agent. The act was held to be within the general scope of his authority; and, while secret instructions might take away the power, one ignorant of them could not be permitted to suffer loss because of his ignorance of such secret instructions, having in good faith relied upon the general authority conferred. This rule is as applicable to a case where one authorizes an agent to sell a particular horse, the authority being general. The secret instructions as to price or warrant cannot bind the purchaser, as these are ordinarily within the scope of the general authority to sell the horse. *Hatch* v. *Taylor*, 10 N. H. 538; *Hunter* v. *Jameson*, 6 Ired. 252; *Bradford* v. *Bush*, 10 Ala. 386.

There is no testimony in this case that warrants the conclusion that Bucknell had general authority to appoint agents and conduct defendant's business in Michigan. He was advertised as the manager of the branch. Apparently he had charge of the business brought to the office by the various subagents, and was the medium through which such business reached the company. But, unlike the Nebraska case, there is a lack of evidence to show that he had charge of all of the defendant's business in Michigan. He was manager of the Michigan branch, but that does not justify a guess by court or jury that binding the company by the appointment of agents for it was within the general scope of the authority actually given him. In 1 Pars. Cont. 43, it is said:

''We think the distinction between a general agency and a special agent useful, and sufficiently definite for practical purposes, although it may have been pressed too far and relied upon too much in determining the responsibility of a principal for the acts of an agent. It may, indeed, be said that every agency is, under one aspect, special, and, under another, general. No agent has authority to be in all respects and for all purposes an *alter ego* of his principal, binding him by whatever the agent may do in reference to any subject whatever; and therefore the agency must be special so far as it is limited by place or time, or the extent or character of the work to be done. On the other hand, every agency must be so far general that it must cover not merely the precise thing to be done, but whatever usually and rationally belongs to the doing of it. Of late years, courts seem more disposed to regard this distinction, and the rules founded upon it, as altogether subordinate to that principle which may be called the foundation of the law of agency, namely, that a principal is responsible either when he has given to an agent sufficient authority, or when he justifies a party dealing with his agent in believing that he has given to this agent this authority.''

We cannot say that this evidence tends to prove that the appointment of agents usually and rationally belongs to the doing of the business confided to Bucknell, and we certainly cannot say it as a matter of law.

Among the disputed items is one for commissions upon policies issued to some of the stockholders of the Detroit Electric Light & Power Company in connection with a loan made through the Coxes. An attempt appears to have been made to adjust this matter, and Gore received a sum of money which is claimed to have been his full share of the commission. His receipt in full is shown. He says that he signed it because he could not get any money unless he did, and because Mr. Glass promised that the balance in dispute should be settled by the head officers of the company, and under what the plaintiff claims to have been a false representation, viz., that one-half of his commission was taken from him by Cox's order. Another claim was that he was instrumental in procuring the

119 MICH.—10.

policy issued to Muir, and that Bucknell, ascertaining the fact, secured it surreptitiously upon Sunday, through another agent. It is contended on the part of the defendant that an agent is entitled to his commission only when he obtains and presents an acceptable application; but this must depend upon the nature of the contract. A similar claim is made in relation to what is called the Moran insurance, and plaintiff asserts that he was deprived of a portion of his commission by Bucknell. Bucknell claims that he secured that application, and that the plaintiff was not entitled to the commission. We are of the opinion that questions of fact calling for submission to the jury would be found in all of these matters if it could be said that the defendant is responsible for the conduct of Bucknell and Glass. We have found otherwise upon the record, but have alluded to these questions in view of a possible new trial.

We think that it was error to permit the plaintiff to testify to the statements of Bucknell that he and Glass had authority to bind the company by a contract. It was testifying to a conclusion upon the main controversy in the case.

It was also erroneous to allow plaintiff to testify to the alleged statement of Cox that he had not received a portion of the commissions in the Electric Light matter. It was hearsay.

We think it unnecessary to discuss other assignments, as they are substantially governed by the foregoing.

The judgment is reversed, and a new trial ordered.

MONTGOMERY, MOORE, and LONG, JJ., concurred with HOOKER, J. GRANT, C. J., concurred in the result.