[Civil No. 2553. Filed January 9, 1928.]

[261 Pac. 969.]

G. P. LIGHT, H. A. BERRY and MAY W. BERRY, His Wife, Appellants, v. CHANDLER IM-PROVEMENT COMPANY, a Corporation, Appellee.

Messrs. Silverthorn & Van Spanckeren and Messrs. Greer & Greer, for Appellants.

Mr. Charles B. Ward and Mr. Arthur Price, for Appellee.

LOCKWOOD, J.—Chandler Improvement Company, a corporation, hereinafter called plaintiff, brought suit against G. P. Light, H. A. Berry, and May W. Berry, his wife, hereinafter called defendants, to foreclose a mortgage on twenty acres of land situated near Chandler, Arizona, to secure part of the purchase price. The defense to the suit was fraud and deceit in inducing the purchase, with a prayer that the notes and mortgage involved be adjudged to be fully paid and satisfied, that the notes be surrendered and canceled, that the mortgage be released of record, and that defendants recover from plaintiff judgment in the sum of $945, being the excess actually paid in cash for the land over the real value thereof. The issues were presented to a jury, and at the close of defendants' case plaintiff moved for an instructed verdict, which motion was by the court granted, and, after the usual motion for new trial was overruled, defendants appealed.

This is an equity case, and the verdict of the jury, if rendered by it on the evidence, would not be binding upon the court, but the parties have a right to, and it is the duty of the court to listen to, the advice of the jury, even in equity proceedings, no matter whether that advice is followed by the court or not. *Security Trust & Sav. Bank* v. *McClure,* 29 Ariz. 325, 241 Pac. 515.

In determining, therefore, whether the court erred in instructing a verdict, we must consider the matter under the same rules as though such verdict would have been binding. We therefore must accept the evidence in the light most favorable to defendants' case. Taken thus, the facts necessary for the determination of this appeal are as follows:

In the fall of 1919, defendants saw an advertisement that the land in question, then owned by plain-

tiff, was offered for sale, and that one Crenshaw had it listed with him for that purpose. Defendants called upon him and were taken out to examine the land. They spent some half hour's time going over it, and were informed by Crenshaw that all of said land was fertile and would produce good crops, and in particular that it would produce a reasonable crop of cotton; that about eight acres thereof was quite heavy, but that there was no so-called "slick" or "tight" land thereon. Defendants thereupon closed the deal, paying $1,500 in cash, receiving a deed to the land from plaintiff, and giving notes and a mortgage back for $4,500, being the balance of the purchase price. Defendants did not attempt to farm the land themselves, but rented it from 1920 to 1924, inclusive. The tenants first planted it to Sudan grass, and later to oats and alfalfa, and in 1924 it was planted to cotton. During none of these years was a reasonable crop grown upon the land, although all of the tenants had given it at least ordinary care and culture. In 1923, for the first time, the defendants suggested to plaintiff that the transaction was unsatisfactory. At this time in a conversation with one of its officers, defendant Light said:

"I told him we weren't producing anything off of it, and asked him if he would take it back. We were unable to make our payments. . . . I went in and asked him to take it back. We weren't making, it wasn't bringing us in anything, and we couldn't make our payments, and he kind of laughed and said he didn't want to cheat us out of our fortune. . . . In 1924 I asked him to take it back again. I told him we weren't getting anything off of it. We couldn't make our payments."

On cross-examination, the witness was questioned:

"Q. Did you ever go to the Chandler Improvement Company and say to them that you wanted to rescind this land because false representations had been

made to you? A. I didn't give that reason. I said we weren't getting anything off of it, and we couldn't make our payments. . . .

"Q. You never hinted to them, did you, that you had been led to buy this land by false representations of anybody, did you? A. No."

This is the only evidence in the record in regard to any offer on the part of the defendants to rescind the contract, or in regard to any alleged false representations of Crenshaw being communicated to plaintiff at any time before filing the answer herein. The evidence also shows that of the twenty acres in question, considerably over half is what is known as "tight land"; that is, it is land covered with a fine sediment from flood water. These soils are very rich, but take water very slowly when irrigated, due to their high content of deflocculated clay. They are better adapted to grain and fine-rooted crops than deep-rooted plants, and require the introduction of some other substance such as straw, manure or Bermuda sod to make them available for general crop production.

The question then is, on this state of the record, Was plaintiff entitled to an instructed verdict? It claims that it was for two reasons. In the first place, because the real estate broker, Crenshaw, was not by it authorized to make any representations as to the quality and productive character of the land; and, such being the case, it was not bound by such representations, even if he did make them, if it had no knowledge thereof. Second, that even if fraudulent representations were made in such manner that it was bound thereby, yet defendants took no action thereon for more than three years after they were discovered, and their claim for damages is therefore barred by the statute of limitations. Civ. Code 1913, par. 711, as amended by Laws 1917, chap. 76, § 1.

Taking up the last point first, we are satisfied that it cannot be sustained. It is true that, had defendants brought an independent action for damages for the alleged fraudulent and deceitful representations, the statute of limitations would have applied to the case. Even then, however, they would have been entitled to have the jury answer an interrogatory under proper instructions as to when such representations were discovered by defendants to be fraudulent. We think, further, it is the well-settled law that a defense of recoupment which arises out of the same transaction, such as a note sued upon, survives as long as the cause of action upon the note exists, although an affirmative action upon the subject of it might be barred by the statute of limitations. 3 C. J. 805. It is suggested by plaintiff that defendants' plea was not one of recoupment, but rather of counterclaim or set-off, and that a counterclaim is subject to the statute of limitations, regardless of the status of the note sued upon. Our statute on counterclaim and set-off was taken from Minnesota, and there it is held that a breach of warranty may be the subject of counterclaim, or it may be set up as a defense by way of recoupment in an action for the purchase price of property sold with warranty, and that the statute of limitations does not run against such defense, and such right must be held to survive and continue as long as the vendor's right of action upon the contract. *Aultman & Co.* v. *Torrey*, 55 Minn. 492, 57 N. W. 211. We think, therefore, that the instructed verdict, if based upon the ground that the statute of limitations had run against defendants' claim for recoupment for false and fraudulent representations, would have been erroneous.

The second point is the vital one in the case. It is contended by defendants that a real estate broker in the selling of land is impliedly authorized by his

principal to make representations in regard to the quality and value of the land, and that the principal is bound by such representations as though he had himself made them. It is insisted, on the other hand, by plaintiff that a real estate broker who is not authorized to convey land, but who merely may find a purchaser upon the terms fixed by his principal, cannot bind the principal by representations in regard to the quality and value of the land, unless he was expressly authorized to make such representations, or unless they are known to his principal before the sale is consummated. There are authorities upon both sides of the question. Defendants cite the cases of *Judd* v. *Walker,* 114 Mo. App. 128, 89 S. W. 558; *Wolfe* v. *Pugh,* 101 Ind. 293; *Millard* v. *Smith,* 119 Mo. App. 701, 95 S. W. 940, and the text of 27 R. C. L. 365, as supporting their position, while plaintiff urges the better rule is laid down in *Mayo* v. *Wahlgreen,* 9 Colo. App. 506, 50 Pac. 40, *Freyer* v. *McCord,* 165 Pa. 539, 30 Atl. 1024, *Decker* v. *Fredericks,* 47 N. J. L. 469, 1 Atl. 470, *Sampson* v. *Beale,* 27 Wash. 557, 68 Pac. 180, and *Nat. Iron Armor Co.* v. *Bruner,* 19 N. J. Eq. 331.

The matter is one of first impression in this jurisdiction, and we are therefore at liberty to adopt the rule which seems to us best in consonance with our general practice, conditions, and public policy. We are of the opinion that plaintiff's position on this issue is the soundest. The other rule originated in England, where land is transferred with comparative rarity, and where an agent dealing with land is impliedly given far more authority over it than is the case with the ordinary real estate broker in western America. There lands were and generally are handled by exclusive agents in whom the owner reposes a special confidence, and to whom a prospective purchaser might well look as being, if not the *alter ego,* at least the *fidus Achates* of such owner. With

us, on the contrary, it is the general custom, when an owner desires to sell his land, to list the same with as many real estate brokers as possible, with specific instructions given to them as to price and conditions of sale, and with an authority which is ordinarily assumed to extend only to showing prospective purchasers over the premises, stating the terms, and, if the property and terms are satisfactory, taking them to the owner for completion of the transaction. If we are to hold the owner of property bound by any and all representations made by any one of a dozen brokers under such circumstances, and liable in an action for fraud and deceit because of such representations, when they are entirely unknown to him and would have been indignantly repudiated, had they been called to his attention, the door to fraud upon the owner will be thrown wide open. We think the authorities supporting plaintiff's position lay down the better rule, and we adopt that as the one to be followed in Arizona.

But, it will be said, has the purchaser no rights, and must he go remediless, or at most have an action against a possibly irresponsible and insolvent agent, when, relying on the latter's conduct, he has entered into a contract with the owner from which the latter has received a pecuniary profit? If such were the result necessarily flowing from the rule laid down, it would, indeed, work with harshness and injustice. The authorities which follow that rule, however, also indicate the proper remedy for the defrauded purchaser. When he discovers the fraud, he has two courses open to him. He may either ratify the transaction so far as the owner is concerned and make the payments, notwithstanding the false representations, reserving the right to sue the agent in damages for such fraud and deception, or he may go to the owner and, stating the fraud, offer to rescind. If the owner, after due notice of the fraud and offer

of rescission, insists upon holding the purchaser to his bargain, he will then be deemed to have ratified the alleged representations of the agent and the purchaser may pursue as against such owner any remedy which he would have had, had the false representations been made by the owner in person. If, on the other hand, the owner accepts the rescission and returns the purchase price, the parties are in *status quo* and justice, as between them, is satisfied.

In the case at bar there is no evidence that any false representations, even if they were made by the agent, were ever communicated or known to plaintiff or any of its officers until the filing of the answer herein. There is no evidence of any offer of rescission on the ground of fraud. One of defendants, it is true, said that he asked plaintiff to take the land back, but expressly stated that the only reason he gave was that the land was unproductive, and that defendants could not make the payments thereon, and that he never at any time suggested that defendants had been deceived or defrauded by any false representations made at the time of their purchase of the property in question. Further, not even in the answer do defendants offer to rescind, but on the contrary, insist on retaining the land in question. To allow a recoupment under such circumstances would, in effect, be compelling an innocent owner of land to sell it against his will on terms to which he had never agreed.

We are of the opinion that before a purchaser who has been deceived by unauthorized false and fraudulent representations as to quality and value made by a real estate broker with whom land has been placed for sale may set up the defense of recoupment for such false and fraudulent representations in an action by the vendor for the purchase price, it must be alleged and proved, in addition to the false representations by the broker, that the

vendor, after knowledge of such representations and an offer of rescission on that ground by the purchaser, refused to accept the rescission. No such knowledge and offer having either been pleaded or proved by defendants, the trial court properly directed the jury to return a verdict in favor of plaintiff. The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.