255 P.2d 195

CHRISTENSEN et ux. v. PRYOR et al.

No. 5531.

Supreme Court of Arizona.

March 23, 1953.

Darrell R. Parker, of Phoenix, for appellants.

Struckmeyer & Struckmeyer, of Phoenix, for appellee Commercial Standard Ins. Co.

A. B. Spector and Foster G. Mori, of Phoenix, for appellees C. A. Saylor, Gregg R. Irvine, and National Surety Corp.

LA PRADE, Justice.

Before taking up the issues made by the assignments we will consider a motion to dismiss the appeal that is *incorporated* in the appellees' answering brief. The motion is upon the ground that appellants failed to file with their designation of the record on appeal a concise statement of the points on which they intended to rely on appeal, not having brought up the complete record (Transcript of Evidence omitted). Citing Rule 75(d), Sec. 21–1822, A.C.A.1939. This case was submitted for disposition without oral argument. Counsel for appellees with their motion filed an answering brief addressed to the issues made by the assignments· and appellants' opening brief. Our attention to the existence of this motion came when we started to study the briefs. It is argued that the failure to file statement of points constitutes grounds for the dismissal of the appeal within the holding of this court, in Davis v. Kleindienst, 64 Ariz. 67, 165 P.2d 995, 996. In this last-named case the appellant filed only a notice of appeal. Within the time prescribed for transmitting a record on appeal the appellant had not filed a designation of the contents of the record required on appeal, nor had he filed a concise statement of the points upon which he intended to rely on appeal. This being the state of the record counsel undoubtedly concluded that he had no record on appeal which could be reviewed. A second notice of appeal was timely filed. On this second notice of ap-peal counsel caused a sufficient record on appeal to be transmitted. It was on the state of the record before the second notice of appeal was filed that we observed that

"* * * Counsel for appellant, being aware of the fact that he had not filed a designation and not having served a concise statement of the points on which he intended to rely on appeal, in compliance with Rule 75(d), Section 21–1822, Id., realized that there would be no review of the judgment in this court."

We do not think that the case is susceptible of being interpreted as holding that a failure to comply with Rule 75(d), requiring a concise statement of points intended to be relied upon on appeal, where the complete record of all the proceedings and evidence is not transmitted, requires a dismissal of the appeal.

"This requirement is imposed in order to give the appellee notice of the grounds upon which the appellant will seek reversal or modification, in order that the appellee may determine whether the proposed record gives a fair and complete picture of the issues to be pressed by the appellant, and if the appellee determines that the proposed record does not, he may then require additional portions of the record, proceedings and evidence to be included by serving and filing his designation for such additional portions pursuant to

Federal Rule 75(a)." 1951 Cum.Supp. Moore's Federal Practice, Sec. 75.06.

A failure to comply with this rule is not ground for dismissal of appeal where the statement was not needed to apprise appellee, or the court, of the points that would have to be met, and the absence of such statement caused no prejudice. Adams v. New York, Chicago & St. Louis R. Co., 7 Cir., 1941, 121 F.2d 808; Ashton v. Town of Deerfield Beach, 5 Cir., 1946, 155 F.2d 40. Appellees do not contend that they are prejudiced or in anywise handicapped by an incomplete record.

We call to attention the fact that this motion was not timely filed. Our rules require that

"All motions to dismiss shall be presented *under separate cover* and a copy thereof together with copies of the moving papers shall be served with the notice of the motion." Rule VII, Subdivision 5, Rules of the Supreme Court. (Emphasis supplied.)

If the failure to file a concise statement of points to be relied upon on appeal handicaps or prejudices a party, he should call such failure to the attention of the trial court or appellate court, and cause a sufficient record to be presented on appeal so that the matter may be disposed of upon its merits. The purpose of the rule requiring motions to dismiss to be presented under separate cover is to insure that the motion will be promptly called to the attention of this court. A ruling can thus be had prior to any undertaking to answer on the merits.

Appellants, plaintiffs below, are here prosecuting their appeal from the judgment of the trial court giving judgment to appellees (defendants) after proofs were submitted by all the parties. Plaintiffs sought to recover damages against defendants Saylor and Irvine, copartners, conducting a real estate business as licensed real estate brokers, on the ground that they, as sellers, had been defrauded by the defendants through the conduct of one W. C. Pryor, a real estate salesman employed in their office, a growing out of a sale of plaintiffs' property which it alleged was being handled for them by Saylor and Irvine through the action and services of Pryor. Plaintiffs' claim was for $11,000, representing $1000 commission paid to Pryor and $10,000 secret profit received by Pryor on the sale and undisclosed. Pryor absconded with the money, and although named as a party defendant no service was had upon him.

From the written findings of fact it appears that at the times here under consideration Saylor and Irvine had in their employ one Charles M. Baldwin, a licensed real estate salesman, whose duty it was in part to secure "listings and prospective listings of real estate available for sale". In this capacity Baldwin contacted plaintiffs and advised them who he was and that he appeared for Saylor and Irvine. On this occasion Baldwin learned from plaintiffs that they had two pieces of property for

sale, an auto court on Van Buren Street and a trailer court on North Central Avenue, both in Phoenix. Baldwin, on returning to the office, turned over to Irvine the information he had secured concerning the Van Buren Street property and to Pryor the details relating to the trailer court, and "requested W. C. Pryor to go out and look at the Central Avenue property, which he subsequently did". Neither listing was in writing. The asking price for the trailer court was $50,000.

Later Pryor advised plaintiffs that he had a prospective purchaser for the trailer court in the person of one Dr. W. E. Balsinger, of Los Angeles, who would not pay the price of $50,000. He advised them that he could not sell the property for more than $40,000 and counselled them to accept that sum. Plaintiffs, not knowing that these representations were false, and believing the same to be true and relying thereon, agreed to sell for $40,000. Plaintiffs signed a preliminary sales agreement to that effect, although no named purchaser was designated. At this very moment Dr. Balsinger had already indicated to Pryor that he would purchase the property for $50,000, and the deal was finally consummated with him for that figure. Pryor advised plaintiffs that he had secured a purchaser for $40,000, and they signed a sales agreement to one "W. Clinton, single" for said amount. Plaintiffs' acknowledgment to this agreement was taken by notary Carl L. Gerard, while

"* * * the said Gregg R. Irvine, in his capacity as a Notary Public, and in furtherance of the business conducted by himself and the defendant C. A. Saylor, did, on January 31, 1947, issue under his hand and seal an acknowledgment of the purported execution by W. Clinton, a single man, of the contract of sale (and quitclaim deed) of the real property involved. * * *" (Findings 28 and 29.)

Presumably, the quitclaim deed, purportedly executed by Clinton, was to Dr. Balsinger, the real purchaser. Appellees admit in their brief that "W. Clinton" was a fictitious name adopted by Pryor and representing himself, "the better to practice his fraud upon the unsuspecting plaintiffs". This admission supplements the somewhat equivocal statements in findings 28 and 29, supra, and compels us to infer that there was no such person as "W. Clinton", though the court found that Irvine, as a notary public, in taking the acknowledgement of the purported execution of the contract of sale and quitclaim deed, now admitted not to have occurred, *was done "in furtherance of the business conducted by himself, Irvine, and the defendant C. A. Saylor"*. (Emphasis supplied.)

Additional findings were that Saylor and Irvine had no actual knowledge of any of the representations made by Pryor to plaintiffs, and that plaintiffs had not relied on Irvine's acts as notary public in taking the acknowledgments of "W. Clinton".

By written conclusions of law the court, among other things, concluded:

"II. That the sub-agent W. C. Pryor was employed in this transaction by the authority of the principals, (plaintiffs) express or implied; that the sub-agent was the agent of the principals and directly responsible to the principals for his conduct.

"III. That in this transaction, even if defendant Pryor was the agent of defendants Saylor and Irvine, and not the agent of plaintiffs, the defendants Saylor and Irvine would not be subject to liability when representations of Pryor as agent were not (a) authorized, (b) apparently authorized, or (c) within the powers of the agent.

"IV. That in this transaction, defendant Pryor had no authority from defendants Saylor and Irvine, either expressly or impliedly, to commit any acts constituting the alleged fraud."

By sufficient assignments of error these conclusions are challenged upon the ground that they are not supported by the findings of fact and are contrary to the findings.

As disclosed from the conclusions of law set forth above the trial court concluded from its findings of fact that the subagent, Pryor, was employed by the authority of plaintiffs, either express or implied, and that the subagent, Pryor, was the agent of plaintiffs and directly responsible to them as principals. We believe this conclusion to be erroneous, and not supported by and contrary to the findings of fact. It it the law that only licensed real estate brokers may engage in the business of a real estate broker, Section 67–1703, A.C.A. 1939, as defined in section 67–1702, Id. Likewise by the same sections real estate salesmen must be licensed, and as such can only accept employment and compensation from duly and legally licensed brokers.

" 'Real estate salesman' or 'salesman' means a person who is employed by a broker to do the things or any thereof in respect of which the business of a broker is conducted; * * *." Section 67–1702, supra.

It is a matter of common knowledge that the prevailing and established practice of real estate brokers is to employ in their office one or more salesmen. Members of the public who patronize realtors do not participate in the selection or employment of their salesmen. Plaintiffs in the instant case were clients of Saylor and Irvine. Their business had been solicited by Saylor and Irvine, through the efforts of their salesman Baldwin. When the salesman Pryor approached plaintiffs he was acting within the scope of his employment and prosecuting the business of Saylor and Irvine, at the direction of their authorized subagent Baldwin. The plaintiffs, after being interviewed by Baldwin and Pryor, rightfully concluded that they had entrusted the contemplated sale of their property to Saylor and Irvine. There is nothing in the

266

situation or in the findings of fact from which it can be concluded that plaintiffs employed or authorized the employment of Pryor. The only thing that can be inferred from their conduct is that they dealt with him not as their agent but as the subagent of Saylor and Irvine.

Appellants argue that the following general rule is applicable to the instant fact situation. The rule is:

"An agent is not responsible to his principal for the acts or omissions of subagents, where, in the course and from the nature of the business, it becomes necessary to employ subagents by reason of their particular profession or skill, or where the appointment of a subagent has been authorized, if the agent has used reasonable diligence and skill in his choice of the subagent. There is, in such a case, a privity between the subagent and the principal, who must, therefore, seek his remedy directly against the subagent for negligence or misconduct." 61 A.L.R. 278.

We do not believe that this rule fits the fact situation under consideration. Pryor had not been selected by defendants to transact this particular piece of business on account of any particular skill that he possessed and which they did not have, nor did the nature of the business generally or in this instance require the selection of a subagent of particular skill different from the ordinary attainments of qualified real estate salesmen. We believe, rather, that the well-recognized exception qualifying the rule is controlling as applied to our facts. This exception is:

"But if the agent, having undertaken to do the business of his principal, employs a servant or agent on his own account to assist him in what he has undertaken, such a subagent is an agent of the agent, and is responsible to the agent for his conduct, and the agent is responsible to the principal for the manner in which the business has been done, whether by himself or by his servant or agent. (And this responsibility would extend to the subagent's failure to carry out his agreement.)" 61 A.L.R. 279–280.

■ To the same general effect are the statements of the rule as contained in The Restatement of the Law of Agency. Section 406. A case directly in point is Reagan v. Dougherty, 1936, 40 N.M. 439, 62 P.2d 810, 811, where it was held that "There is no privity of contract between the principal and a sub-agent employed by a broker unless such employment was at the direction of, or authorized by, the principal." We consider this to be a correct statement of the law.

■ Such being the situation, what is the responsibility of the relators, Saylor and Irvine, to their principal, the plaintiffs? It is the general law, and particularly so in this jurisdiction, that a confidential relation

exists between a real estate broker and his principal, and a broker owes the utmost good faith and loyalty to his principal. Haymes v. Rogers, 70 Ariz. 408, 222 P.2d 789, 17 A.L.R.2d 896; Leigh v. Loyd, 74 Ariz. 84, 244 P.2d 356. If a realtor, by false and fraudulent representations, practices any kind of fraud upon his client, to the latter's damage, he is responsible therefor. Typical of these practices is where the realtor, by selling to himself or through a dummy, makes a secret profit. 12 C.J.S., Brokers, § 41. And, a real estate broker must answer in general damages to his principals for his salesman's breach of faith in reselling at secret profit realty purchased by the salesman from the principals, although the broker was not personally aware of the circumstances of such transaction. Ridgeway v. McGuire, 1945, 176 Or. 428, 158 P.2d 893.

Defendants contend that the rule is otherwise in Arizona, citing Brutinel v. Nygren, 1916, 17 Ariz. 491, 154 P. .1042, L.R.A.1918 F, 713; Light v. Chandler Improvement Co., 1928, 33 Ariz. 101, 261 P. 969, 57 A.L. R. 107; Cameron v. Lanier, 1940, 56 Ariz. 400, 108 P.2d 579. There are some general statements in these cases which, taken out of context, seem to indicate that we have heretofore held that a broker has no implied authority to make false representations that will authorize an action of deceit against his principal. The general statements made must be read in the light of the fact situation in each case.

In the Brutinel case, supra, the subagent selected by the agent was suing for a commission that he claimed he had earned in the sale of the principal's property. The agent was the principal's drugstore manager, whom she had authorized to find a purchaser for her business, upon terms and conditions satisfactory to her. The agent, without the consent or knowledge of the principal, hired a subagent who effected the sale. The holding of the court was that from this authority, to a drugstore manager, it could not be implied as a matter of law that the agent had power to bind his principal by an agreement to pay another a commission for making a sale.

In Light v. Chandler Improvement Co., supra, the purchaser attempted to recover damages from the seller on account of false representations made by the seller's realtor agent because of claimed false representations made as to the quality of land. The holding was that a real estate broker who is not authorized to convey land, but who merely may find a purchaser upon the terms fixed by his principal, cannot bind the principal by .representations in regard to the quality and value of the land unless he was expressly authorized to make such representations, or unless they were known to the principal before the sale was consummated. The effect of the holding of the court was that a seller, under these circumstances, does not impliedly authorize representations in regard to the quality and value of land. These matters are matters

of opinion and generally the subject matter of "puffing" [33 Ariz. 101, 261 P. 971]. The court pointed out that the sales authority is "ordinarily assumed to extend only to showing prospective purchasers over the premises, stating the terms, and, if the property and terms are satisfactory, taking them to the owner for completion of the transaction."

Cameron v. Lanier, supra [56 Ariz. 400, 108 P.2d 580], is readily distinguishable from the facts in the present case. In that case an attempt was made to recover on a promissory note which a local manager of a trucking firm had executed by signing the principal's name, "by Frank M. Spidell". The agent borrowed the money for his own use. The holding was "that the power of binding a principal by a promissory note can only be conferred by direct authority of the party to be bound, or by necessary implication when the duties which admittedly the agent may perform cannot be discharged without the exercise of such a power".

We are satisfied that nothing said or held in the foregoing Arizona cases sustain the position of appellees in this case.

■ The liability of the corporate sureties arises by virtue of their having furnished surety bonds (limited to the amount specified therein) and guaranteeing that the assured would faithfully perform their duties as required by law. These sureties, having undertaken to insure the faithful performance of the broker's duties generally and under the act requiring them to give bond, section 67–1714(c), A.C.A.1939, the bond included the acts of the broker's agents who were employed and licensed under the same act to perform those duties. Dodge v. National Surety Co., 1930, 110 Cal.App. 618, 294 P. 741.

■ We therefore conclude and hold, as applied to the facts in the instant case, that the mere dealing with a subagent without having participated in or consented to his employment as a subagent, does not make such subagent the agent of the principals to the extent of relieving the original agent of liability for the fraud and deceit of such subagent, committed within the scope and apparent authority of his employment by the original agent, and resulting in injury to the principals.

The judgment is reversed with instructions to enter the judgment for plaintiffs below.

PHELPS and UDALL, JJ., concurring.

STANFORD, Chief Justice (dissenting).

I claim that W. C. Pryor had no authority to deal with appellants, the Christensens, in the manner in which he did deal with them. When Pryor approached the Christensens after the Christensens had listed their property with Saylor and Irvine, he said he was an agent of Saylor and Irvine and that he had a buyer named W. C. Clin-

ton, and that Clinton would pay $40,000 for the property in question. The Christensens sold to Clinton, not knowing that he was a fictitious person.

The court found the following in the findings of facts, in connection with the action of Gregg R. Irvine:

"38. That the action of Gregg R. Irvine as a Notary Public on January 31, 1947, in connection with the acknowledgment of an agreement for the sale of real property, and his action as a Notary Public on February 3, 1947, in connection with the acknowledgment upon a quit claim deed, all relating to the sale of Lot 3 Woolf Tract, *were not relied upon by the plaintiffs in entering into said sale* of Lot 3 Woolf Tract." (Emphasis supplied.)

In this regard, while it is the law that all notary publics should make a record of each and all such real estate acknowledgments, and require identification of the person who signs the instrument, yet in this case that was not done but it is taken care of by the above finding of fact of the trial court.

In 1916 this court rendered an opinion in the case of Brutinel v. Nygren, 17 Ariz. 491, 154 P. 1042, 1044, L.R.A.1918F, 713, it being a case where Mrs. Brutinel was the owner of a drugstore in Clifton, Arizona, and C. P. Dunn, her son-in-law and by profession a druggist, induced her to purchase the drugstore, that forming the basis of how she came to own it, Dunn promising here that he would manage the business for her. Some time thereafter Dunn decided to leave Clifton. He asked Mrs. Brutinel for the right to find a purchaser for the business. She consented, with the understanding that the purchaser would purchase on terms satisfactory to her. A Mr. Nygren, who was also engaged in the drugstore business, claimed that Mrs. Brutinel was indebted to him on account of the transaction and brought his action for services. The basis of the action which Nygren brought was a letter from Dunn, the son-in-law. Dunn's letter closed by stating, "Will make terms on half, if desired, and if party is reliable". Mrs. Brutinel never saw the letter written by Dunn. Nygren sold the store through Dunn's solicitation and Nygren brought an action.

This court, in disposing of the case, cited the case of Gore v. Canada Life Assur. Co., 119 Mich. 136, 77 N.W. 650, and said:

"The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and like a railroad crossing suggests the duty to 'stop, look, and listen,' and if he would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority, and in case either is controverted the burden of proof is

upon him to establish it. In fine, he must exercise due care and caution in the premises."

From Mechem on Agency, Vol. 2, 2d Ed., Sec. 1988, we quote:

"No liability for representations if any representation is outside authority. —But if, on the other hand, the making of any representation concerning the subject matter could not be deemed to be within the scope of the authority, then obviously the making of false or fraudulent ones cannot be; and (unless the principal, by some act can be deemed to have ratified or adopted them, under the circumstances considered in a following paragraph), responsibility for them will not attach to him."

In this court's case of Litchfield v. Green, 43 Ariz. 509, 33 F.2d 290, this court again recognized the case of Brutinel v. Nygren, supra, and quoted generously from that case.

In our case of Lois Grunow Memorial Clinic v. Davis, 49 Ariz. 277, 66 P.2d 238, 241, this court again stated the general rule as follows:

"* * * As a corollary to these principles, it is generally accepted that when one deals with a known agent, he must exercise due caution in ascertaining whether the agent is acting within the scope of his authority, if he wishes to bind the principal. * * *"

As a definite indication of the class or kind of man Pryor was, the record here shows that he remained in the city of Phoenix for nearly a year after this transaction; that he individually took over the property on North Central Avenue which was sold by these appellants, in behalf of the purchasers, Dr. Balsinger and his wife. The records, by his letter to them, shows that he collected the rents for them, and everything indicates that he was a man who was looking forward to advancing himself and not the brokerage company of Saylor and Irvine. Nothing is shown in the record that Saylor and Irvine got a cent out of this transaction. It was wholly a concoction by Pryor. It was done by fraud and connivance, never, indeed, authorized by this brokerage firm. Had this firm received any benefits from the $11,000 which Pryor made from his dealings with the Christensens, as the Christensens claim, certainly it could have been found and some proof of it could be placed in the testimony, and the trial court recognized that by its findings of facts and judgment. Therefore, Saylor and Irvine knew nothing of this transaction. Pryor entered into this action of fraud and deceit without any knowledge on their part.

In the findings of facts made by the trial court are the following:

"34. That any and all representations made by the defendant W. C. Pryor, relating to the sale of plaintiffs' interest in Lot 3 Woolf Tract, were not made with the knowledge, assistance or consent of either C. A. Saylor or Gregg R. Irvine."

"35. That the plaintiffs received the sum of One Hundred Dollars ($100.00) from W. C. Pryor in consideration for an option from the said plaintiffs to the said W. C. Pryor for the lease of said Lot 3 Woolf Tract; that neither C. A. Saylor or Gregg R. Irvine furnished said one hundred dollars ($100.-00) or any part thereof; that neither said C. A. Saylor or Gregg R. Irvine had any knowledge of said option transaction between the plaintiffs and W. C. Pryor."

In final, on the subject of Pryor exceeding his authority, I quote again from Brutinel v. Nygren, supra:

"The fundamental idea, therefore, or seed grain, so to speak, of agency, has its conception in something lawful that a person may do, and a delegation by such person to another of the power lawfully to do that thing."

NOTE: Justice WINDES being disqualified, having tried the case in the lower court, the four remaining Justices have made a determination in this case.