420 P.2d 592

**KAMMERT BROTHERS ENTERPRISES, INC., a corporation, Appellant,**

v.

**TANQUE VERDE PLAZA COMPANY, a corporation, Appellee.***

No. 2 CA–CIV 76.

Court of Appeals of Arizona.

Nov. 18, 1966.

Rehearing Denied Dec. 23, 1966.

Review Granted Jan. 31, 1967.

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8110. The matter was referred to this court pursuant to section 12–120.23 A.R.S.

Chandler, Tullar, Udall & Richmond, by Robert S. Tullar, Johnson, Darrow, D'Antonio, Hayes & Morales, by J. Mercer Johnson, Lesher, Scruggs, Rucker, Kimble & Lindamood, by Robert O. Lesher, Tucson, for appellant.

Morris M. Grupp, San Francisco, Cal., Boyle, Bilby, Thompson & Shoenhair, by Richard M. Bilby, Tucson, for appellee.

WILLIAM C. FREY, Superior Court Judge.

This is an appeal from a judgment in the sum of $244,399.14 in favor of the plaintiff, Tanque Verde Plaza Company, a corporation, hereinafter referred to as "buyer" and against Kammert Brothers Enterprises, Inc., hereinafter referred to as "seller." The action arises out of a contract for the sale of real estate between two closely-held corporations.

The seller-corporation is owned equally by its officers and directors, the same being:

Gilbert J. Kammert, President
Richard Kammert, Vice President
Robert J. Kammert, Secretary
John A. Mulcahy, Treasurer.

The buyer's owners, directors and officers are:

Eugene H. Schamber, President
Rose (Mrs. Angelo) Damiano, Vice President
Angelo Damiano, Secretary
Mrs. Eugene Schamber, Treasurer.

Mr. Damiano was the principal negotiator for the buyer-corporation.

Though the transcript of evidence is lengthy and the exhibits many, pertinent facts are largely without dispute. In those few cases of dispute, either both versions of the evidence are stated herein, because of uncertainty as to which version of the evidence is favorable to upholding the judgment below, or that interpretation of a conflict in evidence is stated which is favorable to upholding the judgment below. Safeway Stores, Incorporated v. Cone, 2 Ariz.App. 151, 406 P.2d 869 (1965); Curlee v. Morris, 72 Ariz. 125, 231 P.2d 752 (1951).

The contract in litigation pertains to 32½ acres of commercially zoned land

near Tucson, Arizona. Final documents of sale were executed on April 12, 1960. By the terms of the contract, the total purchase price was to be $390,000 payable as follows:

"$60,000.00, cash upon the execution of this contract by the parties hereto, and receipt of which is acknowledged by the seller.

"$330,000.00, the balance, shall bear interest at 6% per annum from April 11, 1960. Said interest to be computed on the unpaid balance from time to time. Said interest payments to be payable in quarterly installments, starting June 15, 1960, and quarterly thereafter. The principal installments due hereunder shall be payable as follows:

"Not less than $50,000.00 on or before March 1, 1961; Not less than $100,000.00 on . or before March 1, 1962; Not less than $100,000.00 on or before March 1, 1963; and the balance of $80,000.00 on or before March 1, 1964."

At the time of the execution of the final contract, deeds to the property in question, including a conveyance back to the seller in the event of a default, were placed in escrow. Written escrow instructions were signed by the parties which provided that the balance of the purchase price would be paid to the escrow agent, and that upon payment in full of the purchase price, the deed from seller to buyer was to be recorded by the escrow agent. The contract provided for delivery of possession as of closing and, inter alia, "* * * that time of payment shall be of the essence of this contract * * *."

The $60,000 down payment was timely made. The June 15, 1960, interest payment was made one day late as was the September 15, 1960, interest payment. The December 15, 1960, interest payment was made on January 20, 1961. There was no objection made by the seller to these late payments. On March 1, 1961, a $50,000 installment on the principal sum became due and has never been paid.

The buyer had planned on securing a loan to finance the construction of a shopping center on the subject property in sufficient amount to meet its cash obligations under the land purchase contract. This it was not able to do. There was a contention made in the buyer's complaint that the real estate broker who negotiated this contract had misrepresented facts as to his ability to secure tenants and financing, but there was little proof of any such misrepresentations, and there was no showing that the seller had authorized any such representations. Nor was there any proof that the buyer had made such representations known to the seller, together with an offer to rescind, so as to impress responsibility upon the seller for any such misrepresentations under the doctrine of Light v. Chandler Improvement Co., 33 Ariz. 101, 261 P. 969, 57 A.L.R. 107 (1928). At the conclusion of the trial, no interrogatory was submitted to the jury on the issue of fraud. The judgment rendered below is predicated solely on a breach of contract theory.

Being unable to make the March 1, 1961, payment when due, the buyer asked for an extension. On March 9, 1961, the seller's attorney wrote to the buyer's attorney and informed him that the seller had authorized an extension from "* * * March 15, 1961, to April 30, 1961, * * *" providing that the entire $50,000 due would be paid on April 30, 1961, and that all due and accrued interest would be paid on the same date. The letter stated that it was the writer's intent to amend the presently existing contract by the letter and concluded with "I hope this does the job." There was no formal extension signed by the seller. The letter of extension was acknowledged by a return letter by the buyer's attorney who stated it was his un-

derstanding that the grace period provided by statute would begin to run on April 30, and would not expire until the end of May. The record discloses no response to this last letter.

Being unable to make payment as provided in the March 9 letter, the buyer again requested an extension. On June 6, 1961, the seller's attorney wrote another letter to the buyer's attorney stating that the seller "* * * will agree that payments shall be suspended for 120 days from this date, * * *" on certain terms and conditions set out in the letter. These terms and conditions required (1) that there be a payment of $150,000 principal plus accrued interest within 120 days, (2) that the seller receive within 120 days a negotiable promissory note from a Mr. Max Schmidt in the sum of $180,000 payable in three equal annual installments plus interest, (3) that such note would be secured by a realty mortgage upon the El Tanque property subject only to a construction money mortgage of $1,300,000, and (4) that Mr. Damiano at the time of the granting of the extension personally execute a $15,000 demand note with interest at 6 per cent, which note would be held in escrow by the buyer's attorney until 120 days from date, at which time it would be delivered to the seller's attorney in the event the $150,000 cash and the $180,000 note had not been delivered to the seller by that time. The fifth condition stated in the letter was:

"5) If the payments referred to above and delivery of the Schmidt note and mortgage are not completed within 120 days from this date, Mr. Damiano will turn over to Kammert Brothers Interprises, Inc., through me, [seller's attorney] all of the architectural plans, drawings, etc., which are in the possession of his building corporation and which relate to the construction of a shopping center on the El Tanque property. He will also deliver to Kammert Brothers Enterprises, Inc., any and all leases and commitments for leases to the shopping center referred to which he or his company has entered into or negotiated up until that time."

The letter closed with the request that the buyer's attorney draft an appropriate document to reflect the new agreement between the parties if the terms of the letter were acceptable. The buyer's attorney wrote a letter in reply advising that the buyer was in agreement with all the terms of the June 6 letter with certain exceptions, among them being an increase in the amount of a construction mortgage for the shopping center, and further that there should be a proviso to the effect that the buyer retained the right to proceed with the original contract, that is, paying $50,000 plus accumulated interest during the 120 day extension contemplated. There appears no written acknowledgment of this letter from the seller's attorney, and no formal written extension agreement was ever executed.

Mr. Damiano testified that he understood that the extension granted in the June 6 letter was to expire September 30, 1961, rather than on October 4, 1961, which would be 120 days from the date of the letter.

The buyer encountered great difficulty in promoting the contemplated shopping center. The original layout planned was for an unorthodox circular type of construction. After certain commitments were secured for the leasing of portions of such a structure, the buyer decided that costs of construction would be prohibitive. Plans were changed to a more orthodox rectangular plan, which required new commitments from tenants. An appropriate mortgage commitment was never secured.

By the spring of 1961, the buyer was attempting to sell or trade its equity in the property to others. The Max Schmidt mentioned in the extension of June 6, 1961, was the owner of shopping center property in California, whom the buyer had interested in taking over the venture here in Tucson. The Schmidt shopping center was to be traded to the buyer in exchange for its interest in the subject land, in addition to other substantial considerations which Schmidt was to give the buyer. This, how-

ever, never occurred because necessary financing was never forthcoming.

On September 30, 1961, officers of the seller and the officers of the buyer, together with Mr. Schmidt, met in Tucson, Arizona, to discuss the subject contract which was about to become in default again. The testimony as to what conversations occurred at this meeting is in disarray. Mr. Damiano testified that the representatives of the seller agreed that the buyer's interest would not be forfeited for ninety days, that if a firm commitment for a construction money mortgage was not received within forty-five days, the buyer would have an additional forty-five days to sell the land at a price of $600,000, the seller to receive $330,000 plus interest first, the buyer next to receive back its investment estimated at $150,000, and the seller to receive the balance or "profit." Mr. Bilby, the buyer's attorney, testified that the buyer was informed at this meeting that it was given a ninety day extension from that date, and if it was able to obtain a firm commitment for a mortgage sufficient to finance the contemplated shopping center that an additional ninety day extension would be granted. Both Damiano and Bilby testified the extension was conditional upon Damiano personally agreeing to pay interest and taxes accruing during the extension. The seller's testimony was that its officers stated they would not sell the property to anyone else for forty-five days, and that if the buyer secured a "* * * bona fide commitment [within forty-five days] we would still go through at the Damiano price." The buyer's request to put whatever agreement had been reached in writing was refused by the seller. By answer to interrogatory the jury found that the seller had agreed that the buyer would have until January 1, 1962, to pay the amounts owing under the contract.

During the first days in October, the seller requested and received the $15,000 Damiano note. This note has never been paid. Seller did not demand or receive the architectural plans or the commitments for leases which had been secured by the buyer,

its testimony at the trial being that it considered these to be of no value. Without informing the buyer, the seller placed with the escrow agent on October 3, 1961, the following written instruction, which was signed by seller's officers in the presence of the manager of the escrow company:

"This is your authority to accept no more payments of any kind on this collection unless specifically instructed to do so by Kammert Bros. Enterprises, Inc., in writing. As of this date we declare this contract in default, and you are so instructed."

The president of the seller-corporation testified that, at the time this notice was given, the manager of the escrow company informed him that the notice would not have the effect of causing the escrow company to refuse acceptance of payments tendered and that under its instructions it would have to accept payments tendered at any time while the escrow was open.

Representatives of the seller thereafter went to California to view the properties which Mr. Schmidt had agreed to transfer to the buyer in trade for the Tanque Verde property. The seller was contemplating taking over the Schmidt deal and paying to the buyer that which it had invested in the Tanque Verde property. Returning from California, dissatisfied with the Schmidt property, the seller informed the buyer's counsel, approximately six days after the meeting of September 30, that the seller would require that it receive the $210,000 cash which was to be raised by mortgaging the California property to be received from Schmidt and the $180,000 note which Schmidt was to give the buyer and, in addition, the $15,000 Damiano note would have to be paid. The buyer's counsel was informed that if the buyer would agree to such terms, the seller would grant an extension to November 15 to get a commitment, and if a written commitment for a mortgage had been secured by that time, the buyer would be given until February 1 to close the deal. The buyer's counsel made no protest as to this demand and informed

the seller's officers that he could not commit the buyer to this proposal, but he would inform the buyer thereof. There is no evidence of an acceptance by the buyer of this proposal. At the trial, seller's officers testified that from this time forward they considered the buyer's interest in the property to have been terminated and that the seller had no further intention of selling the property to the buyer at the original purchase price.

Between September 30 and November 15, Mr. Damiano made ten to fifteen trips to Los Angeles to attempt to secure leases or commitments in connection with the Schmidt exchange agreement. On October 25, 1961, the representative of the seller sent to the buyer's counsel a tax bill on the part of the subject land for the first half of 1961. The tax bill which was sent to Mr. Damiano on October 25, 1961, was never paid by him or the buyer, but was subsequently paid, when delinquent, by the seller. On November 1, 1961, Mr. Damiano paid $376.84 for the first half of 1961 taxes on another portion of the subject property, believing that this tax payment included all of the taxes then owing upon the subject property.

The seller and buyer discussed during the last two weeks of November, 1961, a joint venture to promote the shopping center, but on December 4, 1961, the officers of the seller informed the buyer that they would not be able to go into the joint venture agreement for tax reasons. At this time, the seller informed the buyer that seller did not wish to forfeit the interest of the buyer in the subject property because in so doing it would be subject to a substantial income tax. In this connection the seller stated that it would not cause the conveyances back to the seller to be recorded until after the first of the year. There was evidence that the buyer understood that as of the first of the year, its interest would be forfeited unless it had satisfactorily met its obligations under the contract by that date. The following is part of Mr. Damiano's cross-examination on this point:

"Q Was it your understanding that by their agreeing—by their stating that they would not record any deeds until after the first of the year they were recognizing the existence of your ninety day extension, is that what you—

"A That is correct.

"Q And you yourself recognized, then, that you had to fish or cut bait by the first of the year?

"A That's right, Mr. Tullar."

On December 18, 1961, the buyer learned of the written notice given to the escrow agent by the seller on October 3, 1961. On December 19, 1961, and December 21, 1961, telephone calls were had between the buyer's lawyer's office in San Francisco and Gilbert J. Kammert, president of the selling corporation in Tucson, Arizona. Mr. Kammert spoke alternately to Mr. Damiano and to Mr. Grupp, seller's lawyer, whom Mr. Kammert understood at that time to be a prospective investor in the subject property. These calls were recorded, unbeknown to Mr. Kammert, and these records were admitted in evidence in the trial of this action.

The seller's president was informed in these conversations that the buyer had located parties who were willing to take over the subject contract and to pay the amount then due on the contract plus interest, or to pay the entire unpaid principal plus interest, at seller's option. On December 19, Mr. Kammert declined to accept this proposal. He stated that his brother, Robert, was there with him and that this brother took the position that the seller should demand an additional $50,000 on the sales price, inasmuch as the land had increased in value since the original contract had been negotiated. In the December 21 conversation, Mr. Kammert stated he had spoken to one other stockholder of the seller but had been unable to talk with his brother, Richard, about the proposal voiced in the December 19 telephone call. According to him, he had talked with Mr. Mulcahy who agreed that the price should be increased. He further stated that in a prior

meeting of "the boys," it had been agreed that the purchase price should be $400,000. In response to direct inquiries as to whether the seller would go ahead at the original price, the seller's president stated:

"I don't know. I don't know, I might get the boys to compromise, but I'm— I'm pretty d—— sure they won't go and I'm—I don't feel I should either Ang [nickname for Damiano] at the 330."

\* \* \* \* \* \*

"\* \* \* I just can't see going ahead on that, on that 330 price, even with interest paid up."

In the conversation, the seller's president stated the seller was interested in keeping the old contract alive because on forfeiture the buyer would have to pay $100,000 in income taxes. The seller's president terminated his remarks about the proposal of the buyer to pay the original purchase price by stating, "\* \* \* I don't think there's a chance in ten thousand of us taking it." He was informed that, if he changed his mind, he should call Mr. Grupp, which he did not do. All during the subject conversations, there was no indication, express or implied, from those talking in San Francisco, that the seller-corporation did not have the right to refuse the original purchase price and demand more money.

On December 28, 1961, representatives of the seller and buyer met in Tucson, Arizona. Buyer's testimony was that the seller's representatives agreed to accept the balance of the original contract, $330,000 plus interest, if Mr. Damiano would give a $10,000 note in addition, the latter to compensate the seller for various expenses incurred by it by reason of the prior inability of the buyer to perform. This was agreed to by the buyer and Mr. Damiano. The next day Mr. Damiano, according to buyer's testimony, notified the seller's representatives that the investors located by the buyer would not "come up" with any money until the seller agreed in writing to go ahead with the new oral agreement. This the seller refused to do, saying, "\* \* \* 'You come up with the three

hundred thirty thousand dollars plus the interest and the note, we will close.' " No tender was made in connection with any such modification.

On December 29, 1961, the buyer gave written notice to the escrow agent that the buyer declared the contract "in default" because of the refusal of the seller to accept payment "tendered" on the contract. On this same date, the seller was informed by letter that the buyer was declaring the contract in default because of failure to accept either one of two "offers" made immediately prior to Christmas, to wit, either to pay all payments due plus accrued interest or to pay the total principal then owing plus interest. The seller was informed in this letter that if the seller wished to cure its "default" it could make suitable arrangements with the buyer's counsel. Still the buyer made no tender to the escrow which was still open.

On January 9, 1962, the seller made demand of the escrow agent that it record the instruments held in escrow to vest the title of the subject property back in the seller. This demand was refused by the escrow agent.

On January 12, two members of the group of investors who had been located by the buyer to take over its contract came to Tucson to talk with the representatives of the seller. At this time these investors were informed that the seller would not proceed with the original contract, but would sell the land for $390,000 on a new contract. The investors were not interested in this offer and departed. At the trial it was established that these same investors would have been financially able on December 21, 1961, and on January 12, 1962, to have taken over the obligations of the buyer under the original sales contract.

On January 29, 1962, the seller-corporation gave notice to the escrow agent that the subject contract "\* \* \* has long been in default" and the escrow agent was instructed to record immediately two deeds and assignments which vested the title of the subject property back in the seller-cor-

poration. The letter was verified under oath by Gilbert J. Kammert, seller's president. Upon the written request of the escrow agent that indemnification be given to the escrow agent, the seller gave a letter of indemnity, and the deeds vesting title back in the seller-corporation were recorded on January 31, 1962. Prior to this, there never had been a written notice giving the buyer any particular time to bring the contract up to date with an appropriate payment.

Specially devised escrow instructions in the form of a letter signed by the parties when the escrow was opened on April 11, 1960, provided in part:

"You are further instructed to receive for the Vendor and disburse to it all payments made by or for the Vendees, according to the applicable provisions of the sale contract. When the entire purchase price has been paid according to the contract, you are instructed to record the deed from Kammert Brothers' Enterprises, Inc. to Tanque Verde Plaza Company.

"In the event of any default by the Vendees, you are instructed to advise the Vendor of the same and thereafter on notice from the Vendor, you are instructed to record both the deed and assignments from Tanque Verde Plaza Company to Winter-Luety, Inc., to Kammert Brothers' Enterprises, Inc.[1] In this connection, notice by Vendor directing recording of the last two instruments named shall be in writing and signed by an officer of the corporation. You will accept for this purpose the signature verified by affidavit to be that of an officer of the company."

Printed escrow instructions provided, in part:

"The parties hereto expressly agree that in the event of default in the making of any payments of the purchase price or other obligations, provided by the terms of the accompanying Articles of Agreement, to be made to you at the time and in the manner therein specified, and upon filing with you an affidavit declaring forfeiture as provided under Arizona statute, all papers listed above will be returned to the party of the first part [seller]."

A pertinent provision in the contract of sale provided:

"It is expressly understood and agreed that each and every thing to be performed by the buyer, under the terms of this contract, shall be considered to be a condition. Upon any default on the part of the buyer of any of the terms, conditions or covenants herein contained and by him to be kept and performed, the seller may, at his own sole option and discretion either (1) forfeit and terminate this contract, in which event the seller shall declare this contract forfeited, and all rights of the buyer hereunder shall thereupon cease and terminate and all sums of money theretofore paid hereunder shall be forfeited to and retained by the seller as liquidated damages, and the buyer shall immediately deliver to the seller peaceful possession of said premises, and the seller may forthwith re-enter said premises and all thereof and remove all persons therefrom, and withdraw from escrow forthwith the abstract of title or policy of title insurance and deed hereinabove provided for, or (2) the seller may treat this contract as continuing, and may enforce the same either by specific performance or other appropriate remedy. Waiver of one or more defaults by the seller shall not constitute a bar to declare future default or defaults, nor shall an election to treat the contract as continuing constitute a bar as to the right to declare any future default or defaults, and upon the occur-

---

1. For reasons unexplained in the record, there were placed in escrow a deed and assignment to the subject property from the buyer-corporation (plaintiff in this action) to Winter-Luety, Inc., and a second deed and assignment of the same property from Winter-Luety, Inc. to the seller-corporation (defendant here).

rence of such future default or defaults, to again elect as to the remedy. The affidavit of the seller that default has occurred shall be sufficient evidence of default for the escrow agent to deliver the deed and abstract of title, or policy of title insurance to the seller."

The buyer-corporation in its complaint filed in this action asked for relief in six respects: (1) for damages for monies expended in payments under the contract and in the promotion of the shopping center, (2) for $210,000 damages, " * * * representing the difference between purchase price of said property and the fair market value thereof on the date of defendant's breach of contract," (3) for a declaratory judgment with respect to whether the sales contract was still in full force and effect, (4) that the deed back to the seller recorded to close the escrow be expunged from the record, (5) that all interest owing to the defendant after October 3, 1961, be canceled and (6) for attorney's fees, costs and for such other relief as the court may deem proper. During the course of trial, paragraphs (3) and (4) of the prayer of the complaint were stricken, on the motion of the defendant, based upon statements made during the trial by buyer's counsel that the buyer was not seeking declaratory relief and was not asking that the deed effectuating the forfeiture of the buyer's interest in the property be canceled. Relief asked in paragraph (5) appears to have been abandoned. There was no counterclaim by the seller to forfeit the buyer's interest in the property or to quiet the seller's title thereto. We are concerned therefore only with a suit seeking damages for an alleged breach of contract by the seller of real estate.

Prior to trial, the parties stipulated that the issue of damages would be tried to the court rather than a jury. The matter of liability was submitted to the jury without a general verdict under six interrogatories answered as follows:

"INTERROGATORY NO. 1

"Did defendant Kammert Brothers Enterprises, Inc., agree that plaintiff Tanque Verde Plaza Company had until January 1, 1962, to pay all sums due under the Contract, Exhibit 1 in evidence?" (To this the jury answered "yes.")

"INTERROGATORY NO. 2

"If your answer to Interrogatory No. 1 is 'Yes' then disregard this interrogatory.

"However, if your answer to No. 1 is 'No', did Kammert Brothers Enterprises, Inc. agree that plaintiff Tanque Verde Plaza Company had until November 15 to pay all sums due under the contract, Exhibit 1 in evidence?" (There was no jury answer to this interrogatory.)

"INTERROGATORY NO. 3

"If you find that an extension of time was granted the plaintiff, did the plaintiff, or someone on its behalf, who was able and willing to pay, during the period covered by this extension, offer to pay the defendant the full amount of principal and interest then due and owing on the contract, or the full amount owing whether due or not?" (To this the jury answered "yes.")

"INTERROGATORY NO. 4

"If your answer to Interrogatory No. 3 is 'Yes', did the defendant reject such offers of the plaintiff?" (To this the jury answered "yes.")

"INTERROGATORY NO. 5

"If your answer to Interrogatory No. 4 is 'Yes', was the defendant's refusal to accept such payments done in bad faith?" (To this the jury answered "yes.")

"INTERROGATORY NO. 6

"Did the defendant by its actions lead plaintiff to believe that it had an extension to January 1, 1962, and did plaintiff act on said belief?" (To this the jury answered "yes.")

█ In a breach of contract case, the burden of proof is on the plaintiff to plead and prove a breach. Yeazell v. Copins, 98 Ariz. 109, 402 P.2d 541 (1965). The question of whether a contract has been

breached is ordinarily a question for the jury, Matson v. Bradbury, 40 Ariz. 140, 10 P.2d 376 (1932), but, if the undisputed material facts in the case, together with evidence taken most favorably to support the judgment below, establish that a judgment other than that rendered below is mandated by applicable law, the appellate court should set aside the lower court's judgment and enter the appropriate judgment. Kelsoe v. Grouskay, 70 Ariz. 152, 217 P.2d 915 (1950).

The defendant moved at the close of the plaintiff's case and again at the close of all the evidence for a directed verdict. Subsequent to judgment, it moved for judgment n. o. v. The first assignment of error before this court is the contention that the trial court erred in failing to direct a verdict at the close of the plaintiff's case. This assignment we need not consider, inasmuch as the trial court denied the motion when made, and the defendant having elected to put on its case, this court is bound to consider all of the evidence admitted during the entire trial. Lillywhite v. Coleman, 46 Ariz. 523, 52 P.2d 1157 (1935).

We pass on to the second assignment of error which was that the court erred in denying the motion for directed verdict at the conclusion of all of the evidence, which assignment contends, as did the defendant in the lower court, that the evidence conclusively established (1) that there was no enforceable contract to extend the time of buyer's performance of the original contract, (2) there was no actual breach of such agreement as might have existed and (3) the buyer was guilty of breach of contract precluding its recovery on the contract.

A considerable portion of the briefs is devoted to the question of whether this contract, which both parties acknowledge was required to be in writing in order to be enforceable, A.R.S. section 44–101, could be modified by parol so as to extend the time of performance on the buyer's part for a period of ninety days. While the law is not unanimous in requiring an extension of this kind to be in writing, we believe the majority and better view is that such an extension is not enforceable, in the absence of estoppel, if it does not comply with the statute of frauds:

"Generally, however, and in the absence of any estoppel to assert the statute, a contract required by the statute of frauds to be in writing cannot be changed or modified by a subsequent oral agreement, although there is authority to the contrary." 17 Am.Jur.2d Contracts § 466, p. 937

See also 37 C.J.S. Frauds, Statute of § 232, pp. 731–737; 49 Am.Jur. Statute of Frauds §§ 301 and 308, and annotations 17 A.L.R. 14, 29 A.L.R. 1095, 80 A.L.R. 540 and 118 A.L.R. 1511.

The principle that a party may be estopped to invoke the statute of frauds is well established in Arizona and the buyer defends the judgment below on this basis. In Waugh v. Lennard, 69 Ariz. 214, 226, 211 P.2d 806 (1949), our Supreme Court quoted from 49 Am.Jur. Statute of Frauds § 581, a portion of said quotation being:

Closely allied to the principles of protection against the assertion of the statute of frauds to accomplish a fraud upon the party who has acted in reliance upon an oral contract or the assertion of the statute as a shield to protect fraud is the doctrine of estoppel to assert the statute. It is universally conceded that the doctrine of equitable estoppel may be invoked to preclude a party to a contract from asserting the unenforceability of a contract by reason of the fact that it is not in writing as required by the statute of frauds. As is often said, the statute of frauds may be rendered inoperative by an estoppel in pais. *Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the statute of frauds."* (Emphasis added) 49 Am.Jur. Statute of Frauds § 581, pp. 888–889

The buyer argues that it relied upon the oral extension in question to remove trees from the premises, in consulting with the seller about the drainage problem on the land in December of 1961, in paying a portion of the taxes upon the subject property and in expending "* * * time, effort and money in travel, attorney's, accountant's and appraiser's fees, etc., etc.," in reliance upon the extension.

■ There are several defects in the buyer's estoppel position insofar as showing of reliance *solely* upon an oral agreement. If there was an oral extension at the September 30 meeting, it is crystal-clear that within six days thereafter the seller categorically told buyer's counsel that it was not willing to accept the original purchase price and a new offer of an extension on different terms was offered to the buyer. The evidence is undisputed that at the September 30 meeting the seller refused to put in writing any agreement of extension and this, together with the notice given on October 6, was clear notice to the buyer that no binding extension was intended by the seller.

Both the seller and the buyer agree in the briefs filed in this court that at least up to January 9, 1962, the seller had not exercised its discretion to terminate the buyer's interest in this property and that it was exercising its privilege of keeping the buyer obligated on the contract to that time. Accordingly, any obligations that buyer performed under the contract prior to January 9, 1962, such as the payment of taxes, were clearly not rendered solely on the basis of an oral agreement of extension. Insofar as the removal of trees from the subject property is concerned, there is no showing of any detriment to the buyer. The only detriment that resulted therefrom was to the seller. Neither the costs of removal nor any salvage value of the trees was established. Insofar as the expenditure of time and effort in seeking a financial solution to buyer's problems, it appears from the record that these acts were not referable to the purported oral extension

but to a desperate effort by the buyer to meet its obligations under the original contract before such time as the seller exercised its option to declare a forfeiture.

■ But, even though we rule that any oral extension given was unenforceable because of the statute of frauds, we arrive at substantially the same result, favorable to buyer's position, under other equitable principles. It seems to be well settled that such an oral promise of extension, as found by the jury in this case, may be considered in determining whether a seller has precluded itself from declaring a forfeiture until it has given proper notice of its intention so to do:

> "It is well settled that a vendor by agreeing to an extension of time for the payment of purchase money, or an installment thereof, precludes himself from asserting a forfeiture based on the vendee's delay in payment pursuant to the agreement. Such rule is not dependent upon the validity, as such, of the agreement for an extension, and hence applies even though the agreement is invalid by the reason of the statute of frauds." 55 Am.Jur. Vendor and Purchaser § 630, p. 1023

There is other evidence, besides the oral extension found to have been granted by the jury, which might have been considered by the trier of fact to arrive at a conclusion that the seller was precluded from declaring a forfeiture of the buyer's interest under this contract prior to January 1, 1962.

The evidence is undisputed that the seller had given to the buyer two extensions to meet its obligations under the contract, both of which extensions were granted in an informal manner ·consistent with the manner in which these parties dealt with one another during the many months the buyer was attempting to promote this venture.

Additionally, on October 25, 1961, the seller sent to the buyer a tax bill upon the subject .property, thus evidencing some intention to hold the buyer to its· obligations

under the contract. Subsequent to this time, the seller discussed with the buyer a joint venture agreement to promote the contemplated shopping center, accepting throughout these negotiations that the buyer still had an equity in the property. Additionally, the seller admits it told the buyer that it would take no action to forfeit out its interest in this property until after the first of the year, this decision being dictated by the tax problems of the seller. At all times up to January 12, 1962, the buyer was expending time, effort and money in attempting to hold on to its interest in this real property, and the seller was aware of the expenditure of these efforts and monies in a general way.

■ Taking all of these things into consideration, we hold there was sufficient evidence to bring this case within the line of authority holding that when a seller has:

"* * * waived strict performance of the provisions of a contract as to when payments must be made, he thereby waives prior defaults and cannot forfeit for subsequent failure until the purchaser is notified of seller's intention to insist upon strict performance and given a reasonable opportunity to bring payments to date." Arizona Title Guarantee & Trust Co. v. Modern Homes, 84 Ariz. 399, 403, 330 P.2d 113, 115 (1958)

■ The evidence discloses that the buyer was given notice that the seller was insisting upon performance by the first of the year.[2] In Onekama Realty Co. v. Carothers, 59 Ariz. 416, 425, 129 P.2d 918, 922 (1942), our Supreme Court said:

"* * * when the vendee acquires knowledge of the intent of the vendor to insist on strict performance, *no matter in what form that knowledge comes*, he must within a reasonable time bring his payments up to date." (Emphasis added.)

But, even if the undisputed evidence as to the conversations between the seller and the buyer would require the trial court to find that the buyer had notice of seller's intention to strictly enforce this contract by January 1, 1962, there still remains the question of whether the statutory period expired before the declaration of forfeiture. In its briefs, the seller seems to acknowledge that the thirty day grace period would not commence to run until after the end of an extension of time to perform. In the *Modern Homes* case our Supreme Court said:

"Our view is that the prior defaults having been waived, none thereof can be successfully used as a foundation for forfeiture. The 'time is of the essence' clause would have to be reinstated by notice of intention to require strict performance and the purchaser is not in default until he fails to comply within a reasonable time (to be stated in the notice) after receipt of such notice. * * * [T]he result is necessarily that the purchaser must be allowed the statutory time provided in section 33–741 supra, calculated from the expiration of a reasonable time subsequent to the notice that strict compliance will be required, and notice of forfeiture cannot be given until the expiration of such statutory time." 84 Ariz. at 403–04.

■ We take judicial notice that January 1 of each calendar year is a legal holiday, A.R.S. § 1–301. Under our law, if a person is given to a certain date to perform an act and that day falls on a holiday, the person has until the close of the following day to perform. A.R.S. § 1–303. The first day of "default" under the *Modern Homes* decision began then on January 3, 1962, and our computation leads us to the conclusion that the buyer's grace period did not run out until the close of February 1, 1963. The recording of the deeds back to the seller was, under this view of the evidence and law, one day premature.

■ We do not find any previous breach of this contract by the seller of any

---

2. This evidence is disclosed from the testimony of Mr. Damiano—in response to the "* * * fish or cut bait * * *" question previously quoted herein.

substance. The buyer contends that the notice of October 3, 1961, to the escrow agent from the seller constituted " * * * an abortive attempt to cancel * * * " this contract and as such was a breach thereof. No law is cited to us which supports this contention. We do not regard the October 3, 1961, notice of any legal efficacy. The forfeiture notice to be effective must be clear and unequivocal. 17A C.J.S. Contracts § 408, p. 500; 17 Am.Jur.2d Contracts § 499, p. 974. The subject notice which merely declared the contract to be in "default" fails as a matter of law to constitute a notice of forfeiture, and, indeed, the buyer does not contend that it could serve this purpose.

An escrow agreement once executed can be modified only by the mutual agreement of the parties concerned. 30A C.J.S. Escrows § 5, p. 979; see 28 Am.Jur. 2d Escrow § 11, p. 19. The following quotation is deemed pertinent:

"First, it is undisputed that after delivery as an escrow the grantor or promisor has no power of revocation. The grantee or promisee is in a position of legal immunity or safety. This shows that the transaction has no longer the status of an unaccepted offer. The delivery of the document to the grantee will be specifically compelled after fulfillment of the condition, even though before its fulfillment the grantor has instructed the depository not to deliver it; and the document is operative, even though the grantor has made a conveyance to a third person, or has regained possession of the document and destroyed it." 1A Corbin, Contracts § 249, pp. 418–20.

The buyer also contends that a "repudiation" of this contract was delivered by the seller during the December 19 and December 21 phone calls. These conversations fail to satisfy the doctrine of anticipatory breach of contract. At the time these conversations occurred, the seller had fully performed its obligations under the subject sales con-

tract. A deed to the buyer had already been placed in escrow and all that was required for the buyer to be legally entitled to the delivery of this deed was to tender the amounts agreed upon in the sales contract. Generally, the doctrine of anticipatory breach does not apply to a contract rendered unilateral by full performance on the part of one of the contracting parties. 17A C.J.S. Contracts § 472(2) 6, p. 662; 17 Am.Jur.2d Contracts § 455, p. 919. We believe the following statement from the Restatement of the Law of Contracts to be valid:

"§ 318. Anticipatory Repudiation As A Total Breach

\* \* \* \* \* \*

"*Comment*:

\* \* \* \* \* \*

*e.* The doctrine of anticipatory breach is not extended to unilateral contracts unless the promisor's duty is conditional on some future performance by the promisee. It is immaterial whether the contract was originally thus unconditionally unilateral or has become so by the performance of one party. In neither case can a breach arise before the time fixed in the contract for some performance. *There must be some dependency of performances in order to make anticipatory breach possible.*" (Emphasis added.)

The following statements of law are also pertinent:

"In the law governing performance of escrow agreements, there is no doctrine of substantial compliance to be found; compliance must be full and to the letter, or else it constitutes merely noncompliance." 28 Am.Jur.2d Escrow § 21, p. 31

"Generally, courts hold the parties to an escrow agreement to a strict compliance with the terms and conditions imposed. \* \* \*

"The ability of a party, or parties, to perform the escrow agreement cannot, without actual full performance, amount

to compliance." 30A C.J.S. Escrows § 10, pp. 997–999

 One of the major attacks made upon the judgment below by the seller is that the buyer first breached the subject contract and therefore cannot recover in damages, relying upon the well-established doctrine in the law of contracts that a person who has himself substantially broken a contract cannot recover on it. 17A C.J.S. Contracts § 452, pp. 569–570; 17 Am.Jur.2d Contracts § 365, p. 807. In this case, "* * * each and every thing to be performed by the buyer, under the terms of this contract * * *" was made a "condition" of the seller's obligations under the contract. Generally, conditions must be exactly fulfilled or no liability can arise on the promise which such conditions qualify. 5 Williston on Contracts § 675, p. 184 (3d ed. Jaeger 1961); 17A C.J.S. Contracts § 456, p. 577.

 All authorities agree that performance of such a condition may be excused, and ordinarily a valid tender which has been refused is sufficient excuse for nonperformance. Schmitt v. Sapp, 71 Ariz. 48, 53, 223 P.2d 403 (1950); 17A C.J.S. Contracts § 481, pp. 680–681; 17 Am.Jur. 2d Contracts § 358, p. 798. Generally, however, a tender is insufficient unless the actual money owed is proffered to the tenderee. 86 C.J.S. Tender § 30, p. 572; 52 Am.Jur. Tender § 7, pp. 219–20.

 Some courts have commented upon the attractiveness of money laid upon the table as being the foundation for the requirement in question:

"It is the general rule, too, that the money must be actually shown to the person to whom it is tendered, and some courts have attached much importance to this, on the theory that the sight of money might be highly persuasive in tempting the creditor to accept." 52 Am.Jur. Tender § 7, p. 220

The authorities seem to be in general agreement that the requirements of tender in law are stricter than those required in equity. 52 Am.Jur. Tender § 5, p. 218; 86 C.J.S. Tender § 5, p. 559 and § 27, p. 570. Our own Supreme Court has quoted with approval from Pomeroy's Equity Jurisprudence, Vol. 4 (5th ed.), § 1407a:

"In general, the rules of equity concerning the necessity of an actual tender are not so stringent as those of the law. The following special rules seem to be settled: 1. An actual tender by the plaintiff is unnecessary when, from the acts of the defendant or from the situation of the property it would be *wholly nugatory.*" (Emphasis added) Shreeve v. Greer, 65 Ariz. 35, 41, 173 P.2d 641, 645 (1946)

*Shreeve* was an equity case asking for specific performance, and equitable relief was allowed. We are in law, where damages for loss of bargain are sought, and we hold that while the "tender" made here may be sufficient in equity, there is no evidence of tender to support a damage claim for loss of profits and special damages. The telephone conversations of December 19 and December 21 are, at best, ambivalent. As a predicate for a loss-of-bargain action, we do not believe that they go any further than to show that the buyer was informed by the seller's president that there had been no formal action by the board of directors of the seller-corporation but that in the opinion of the seller's president he didn't believe there was "* * a chance in ten thousand * * *" of the seller accepting the original purchase price. This does not completely close the door, especially since we are concerned with a corporate seller and an offer made in a telephone conversation with little notice. To recover loss of profits in an action at law, we hold that the buyer was required to make a tender of the money owed.

 Contrariwise, considering the notice to the escrow agent not to receive payments without seller's consent and the overall tenor of the "offers" on the telephone, we believe equitable principles precluded the seller from declaring forfeiture before clearly indicating to the buyer that

payment to the escrow agent in the full amount required by the terms of the original contract would be acceptable.

The substantial breach of this contract by the buyer is well established. Two extensions of this contract were given by the seller to accommodate the buyer. The last such extension, specifically providing that "* * * any and all leases and commitments for leases to the shopping center * * *" would be delivered to the seller if payments were not brought current within 120 days from date, clearly gave notice to the buyer that strict performance of the contract would be required as of that date. The consideration for this extension was a $15,000 note given personally by Damiano to cover the interest payment due from the buyer on March 15, 1961. This interest payment has never been paid either by the buyer or by Mr. Damiano. The interest payments due September 15 and December 15, 1961, were never paid. The taxes on approximately one-half of the purchase property which became delinquent the first Monday in November of 1961, were never paid as required by the contract.

The buyer has relied upon the recording of the deeds on January 31, 1962, at the seller's orders as being the "final breach" of this contract justifying the damages rendered below. Our analysis leads us to agree that the seller violated the contract in declaring forfeiture before the stringent requirements of Arizona Title Guarantee & Trust Co. v. Modern Homes, supra, were met. The cases establishing this law in our state appear to be, without exception, cases in equity shielding the buyer against a forfeiture of his interest by a seller who has "waived" the time of the essence clause in the contract. Neither party has cited to us a decision which synthesizes this equity law with the legal principle that a party to a contract who has first materially breached the contract cannot recover in damages from the other party.

The buyer's position here is that it is entitled to recover all of its damage, including payments made upon the contract, loss of bargain and promotional expenses incurred. The seller takes the position that the buyer is entitled to recover nothing. We are constrained by what we believe to be applicable law to go between the two positions.

We believe the decision of Hillman v. Busselle, 66 Ariz. 139, 185 P.2d 311 (1947), gives us guidance in the situation before us. In *Hillman* a buyer was suing for return of earnest money and for damages arising out of the alleged breach of a sales contract pertaining to a hotel. The trial court denied all recovery to the plaintiffs and the appellate court reversed in part, holding that the vendees were entitled as a matter of law to the return of the monies paid upon the contract, by reason, among other things, of the vendors' failure to give notice of forfeiture. The court said in part:

"Certain of the mid-western courts have taken the lead in finding a recission by vendor and, therefore, granting restitution to the vendee if vendor has resold after vendee's default but without an 'effectual termination' of vendee's rights. They have distinguished between a vendee who defaults on his contract (by being late in payment, for example) and one who abandons his contract (e. g. by making it clear that he has no intention of continuing payment at all). Restitution is allowed in the former and denied in the latter instance in an attempt in these cases to harmonize the conflicting principles of unjust enrichment and abhorrence of forfeiture on the one hand and stability of contract on the other." 66 Ariz. at 143, 185 P.2d at 313

And:

"Under all but the strictest rule, and under the theories of recission, default as opposed to abandonment, and unjust enrichment, then, the vendees are entitled to restitution of their down payment. And Arizona has long ago adopted the more liberal view and approach to these

cases. Quoting from Christy v. Arnold, supra [4 Ariz. 263, 36 P. [918] 920]:

'The rule, as laid down by Sutherland in his work on Damages (volume 2, p. 232), is that "on principle, if a contract is rescinded by the vendor, even for the vendee's default, the vendor should restore what he has received upon it; * * *"'

"*At the same time, the vendees because of their own default in being late on payment foreclose their right to any damages they may have sustained, such as loss of profit.*" (Emphasis added) 66 Ariz. at 145, 185 P.2d at 314

We have already noted that buyer's complaint here speaks, after portions thereof were abandoned during trial, in law rather than in equity. But in this state equity and law are combined, and we find no intent on the buyer's part to forego such equitable rights as it might have, so long as equity or law might give it a money judgment.

While our Supreme Court in the *Hillman* decision is speaking of "recission," an equitable doctrine, it is to be noted from the decision that the "recission" enforced by the court was one arising from the improper termination of the vendees' rights, and was imposed as a matter of law (in the sense that there was no contention that the vendors in this case intended to rescind this contract).

Another court has reached similar results. Hauert v. Kaufman, 45 S.D. 132, 186 N.W. 555 (1922); Hauert v. Kaufman, 50 S.D. 203, 208 N.W. 981 (1926). Another court has reached the conclusion that when both the vendor and the vendee default, the contract is "at an end." Silfvast v. Asplund, 93 Mont. 584, 20 P.2d 631, 638 (1933). In at least one state, the vendee's right to recover amounts paid under the contract under similar circumstances is regarded as an action in law for damages. Speer v. Phillips, 24 S.D. 257, 123 N.W. 722 (1909). *Speer* is a case in which the vendor prematurely conveyed the property to a third person, the vendee being in default in payments. The court said:

"At that time plaintiff and defendants were still making propositions to one another looking towards an extension of time of all payments. There was never any termination of the contract, but the same was in full force and effect between plaintiff and defendant at the time of the conveyance to Templeman. Plaintiff is therefore entitled to recover damages by reason of such breach of contract. In Barnes v. Clement, 12 S.D. 270, 81 N.W. 301, this court said that forfeitures were odious in the eyes of the law; and this case also indicated the rule or measure of damages for such a breach of contract to be the value of the payments made, less the value of the use and occupation of the land during the time the same was in possession of the purchaser under the contract." 123 N.W. at 725

A California case has also regarded the right of the vendee to recover payments under these circumstances as being one in law, the action being labeled that of "money had and received." In Cleary v. Folger, 84 Cal. 316, 24 P. 280 (1890), the court said, in part:

"So far, then, as the further carrying out of the agreement was concerned, time being of the essence of the contract, each side had neglected to perform its part of the agreement necessary to consummate the contract, and it was at an end. * * *"

"Now, as both parties have failed to comply with their part of the agreement, and, as we have seen, time being of the essence of the contract, the contract is at an end, the $900 remain in the hands of the defendant *as money had and received* from the plaintiff, subject to be recovered by the plaintiff, less the amount of damages which the defendant may show for the failure of the plaintiff to complete the purchase." (Emphasis added) 24 P. at 281

We believe it to be of the very essence of the "waiver" doctrine as enunciated in Onekama Realty v. Carothers, 59 Ariz. 416,

129 P.2d 918 (1942), and Arizona Title Guarantee & Trust Co. v. Modern Homes, 84 Ariz. 399, 330 P.2d 113 (1958), that an equitable principle is being enforced. Though the court speaks of "waiver," we do not believe that these decisions can be defended on the traditional law of waiver. Waiver has often been defined by the courts, and by our own Supreme Court, as being the " * * * intentional relinquishment of a known right." Murphey v. Valenzuela, 95 Ariz. 30, 386 P.2d 78 (1963). When a payment is accepted late, we can understand that as to this payment there can be found a complete waiver of all right to forfeit arising from the delay in making *that* payment. But, when a contract provides, as does the one before us, that a waiver of one default shall not be considered a waiver of future defaults, and when the seller has conducted itself as it has in this case, always keeping the buyer well aware of the threat of forfeiture, we see no real evidence that the seller intended to relinquish its right of forfeiture for future defaults. We do see evidence in this case of an intentional postponement and other conduct which under the circumstances should require, in equity, that the seller give notice as required by the *Modern Homes* decisions before forfeiture may be invoked. But to hold that the vendor by such or similar conduct intended to waive all prior defaults, so as to give the vendee the right to bring an action in damages as sought in this case, goes beyond any fair interpretation of the evidence.

The equitable nature of the doctrine under discussion is indicated in the *Onekama* decision:

> "The case cited agrees with the general rule laid down by this court that a vendor who has accepted payments after they are due cannot thereafter insist upon strict performance of the contract unless and until he notifies the vendee of such intent and gives a reasonable time for the vendee to bring his payments up to date. But it does not discuss the question of whether after suit

brought defendant must pay, or offer to pay, the delinquent installments as a part of his defense.

> "*The rule above stated is obviously based on the equitable principle that when one has lulled another into security by his conduct he cannot take advantage of such conduct until he has given an opportunity to the deceived party to restore the status quo.* But the correlative of this rule, based on the familiar maxim that he who seeks equity must do equity, requires that when the vendee acquires knowledge of the intent of the vendor to insist on strict performance, no matter in what form that knowledge comes, he must within a reasonable time bring his payments up to date." (Emphasis added) 59 Ariz. at 424–25

We do not think that this doctrine was ever intended to be used as a sword, to recover lost profits and promotional expense, in the particular circumstances of this case. As a shield, we recognize its efficacy, and under the circumstances of this case, uphold the judgment below to the extent only of the payments made upon the contract plus interest thereon only from the date when the seller recovered possession of the subject property.

From our view of this case, the buyer can recover nothing more. There was no evidence in the case as to the value of the use and occupancy of the land in question. However, the evidence does indicate that the seller had valuable improvements in the form of a Par 3 Golf Course, attendant buildings and landscaping. These were all destroyed or removed by the buyer. There is evidence in the record the value of what the buyer removed or destroyed amounted to some $34,500.

To allow either party to recover from the other anything more than what we have set out herein, would defeat the principles of equity involved herein. Sturm v. Heim, 95 Ariz. 300, 304, 389 P.2d 702 (1964); Hassenpflug v. Hart, 89 Ariz. 235, 360 P.2d 481 (1961). Therefore, we see no need to allow buyer to recover interest

paid on the contract and then offset the damages suffered by seller as the result of buyer's use and occupancy of the land under the facts and circumstances of this case.

The attorney's fees are specially challenged in the seller's brief on the basis that attorney's fees cannot be allowed in an action for breach of contract. With this contention, the writer of this opinion agrees. The general rule is that attorney's fees may be allowed only when provided for by statute or contract. Colvin v. Superior Equipment Co., 96 Ariz. 113, 392 P.2d 778 (1964); Commercial Standard Ins. Co. v. Cleveland, 86 Ariz. 288, 345 P.2d 210 (1959). The contract in question specifically provides:

"If any suit shall be brought by either party to enforce or cancel this contract, the prevailing party to said suit shall be entitled to recover all costs and expenses necessarily incurred by him in connection therewith, including a reasonable attorney's fee to be fixed by the court."

In view of this provision, this writer cannot hold that the award of attorney's fees was proper. This suit was not a proper suit for either enforcement or cancellation of the contract in question. If the parties had intended this provision to cover actions for damages for breach of contract, they should have spelled it out. We should not broadly interpret the meaning of language used by the parties. It may well be that they intended not to cover such actions. The words " * * * to enforce or cancel this contract, * * * " are not words of art and they should be given their exact and restrictive meaning.

■ We pass on to the other assignments of error. The next two assignments question the admission in evidence of the opinion of the president of the buyer-corporation as to the value of the subject property and the admission of Exhibits 28 and 42 which are written summaries of the expenses incurred by the buyer in connection with its purchase and promotion of the subject land as a shopping center. We do

not go to the merits of these assignments, because under our view of this case, we fail to see any prejudice. Under our decision, the award of damages as to loss of bargain and promotional expense has been disallowed.

■ The seller assigns as error that the trial court wrongfully submitted an interrogatory to the jury as to whether the seller agreed the defendant should have until January 1, 1962, to pay all sums due under the subject contract. The seller argues there was no competent evidence of such an agreement. An examination of the record discloses there was some evidence of an oral agreement to this effect.

Even if such an interrogatory had no basis in the evidence, we can see no possible prejudice to the buyer. This case was submitted to the jury on special interrogatories in pursuance of Rule 49(g), Rules of Civil Procedure. This rule provides as follows:

"49(g) Special verdicts and interrogatories. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence, or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. *The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be*

*deemed to have made a finding in accord with the judgment on the special verdict."* (Emphasis added) 16 A.R.S. Rule 49(g) Rules of Civil Procedure

■ In submitting a case to the jury in this manner, if the court should submit an interrogatory to the jury as to which there was no evidence to support an answer one way or the other, the trial court, and this court on appeal, would be justified in disregarding such an answer. 89 C.J.S. Trial § 561, p. 318; 53 Am.Jur. Trial § 1089, pp. 755–756.

The next five assignments of error question the submission of each of the five remaining interrogatories submitted to the jury, generally upon the same grounds as stated in its attack upon interrogatory No. 1. This court rejects these assignments for the same reason.

■ In this connection, it is to be noted that the seller has not objected in any way to the failure to submit to the jury any interrogatories submitted by it. Under the subject rule, any questions of fact not so submitted to the jury by interrogatories are deemed to have been resolved by the court in such manner so as to support the judgment below. 2B Barron & Holtzoff, Federal Practice and Procedure § 1053, p. 334.

The next nine assignments of error raise the question of whether the court wrongfully granted various buyer's instructions. These instructions state various abstract principles of contract law pertaining to (instruction No. 6) tender and when tender is unnecessary, (instruction No. 7) the thirty day grace period and the waiver of default by the acceptance of late payments, (instruction No. 9) whether the rejection of an unconditional offer would constitute a material breach of contract, (instruction No. 10) the effect of a material breach of contract by one party insofar as excusing performance by the other party, (instruction No. 11) the effect of hinderance or interference by one party to the contract, (instruction No. 13) the effect of leaving the contract open on the seller's part and failing to give reasonable time to cure defaults, (instruction No. 14) the effect of the buyer or someone on behalf of the buyer offering to pay sums owing under the contract during the time that the escrow remained open, (instruction No. 18) whether an agreement by a third party to perform part of the obligations of one party to a contract is sufficient consideration for an extension, and (instruction No. 19) a definition of "bad faith."

At the trial, counsel for both parties seemed to have misconceived the process of submitting a case to a jury under Rule 49 (g), Rules of Civil Procedure. Of all the instructions requested and/or given to the jury, only instruction No. 19, last mentioned above, had any bearing upon the interrogatories submitted to the jury. The subject rule provides:

"The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue."

No other instructions should be given. 5 Moore, Federal Practice § 49.03[3], p. 2207:

"When the special verdict is used the court should give to the jury only such explanation and instructions as it deems necessary to enable the jury to make intelligent findings upon the issues of facts submitted."

■ That irrelevant instructions were given does not establish that reversible error has occurred. This is particularly so in this case, the result reached being in our view required by the undisputed facts and the resolution of issues of fact by the court in those areas of dispute in which no interrogatory was requested by either party.

■ Buyer's instruction No. 19, gave to the jury a definition of "bad faith." One of the seller's objections raised on appeal, both to this instruction and to the giving of interrogatory No. 5, (asking the jury whether the seller rejected the buyer's offers to perform in "bad

faith") is that "good or bad faith was not material in this case." With this we agree. The definition of "bad faith" given to the jury was: "* * * a willful deliberate refusal to perform its contract without legal cause or excuse." In California, by statute, "bad faith" is required before a buyer may recover damages for loss of bargain on a contract for the sale of real estate.[3] Generally, this is not the law. 55 Am.Jur. Vendor and Purchaser § 555, p. 948; 92 C.J.S. Vendor and Purchaser § 595, pp. 648–649. It is only when the vendor is unable to convey because of bad title or other reasons that "bad faith" comes into discussion in most states. 55 Am.Jur. Vendor and Purchaser § 557, p. 951; 92 C.J.S. Vendor and Purchaser § 592, p. 644. In this case, under the analysis rendered herein, whether the buyer willfully deliberately refused to perform its contract without legal cause or excuse is immaterial to the result reached, and, in any view, "bad faith" is not an ultimate nor even a subsidiary factual issue in this type of case in this state. Accordingly, we see no reversible error.

■ The next two assignments of error question the refusal of the trial court to give the seller's requested instructions formally defining "valid tender" and informing the jury under what conditions nonperformance of contract is excused when performance is prevented by the actions of the adverse party. Again, these instructions are not directed towards any interrogatories submitted to the jury. The closest interrogatory was one asking whether the buyer "* * * did * * * offer to pay * * *." A definition of "valid tender" would not have assisted the jury in answering this question. The seller complains of no failure to submit any interrogatory on "valid tender" or on excusing nonperformance of contract. Under these circumstances, we see no error. Rule 49(g), Rules of Civil Procedure.

■ The next assignment questions the denial by the trial court of a new trial, which assignment raises matters herein previously discussed and, in addition, alleges that the damages rendered are excessive. To the extent that our opinion reduces the damages for other reasons, we honor this assignment. Otherwise not. The granting of a new trial rests largely in the discretion of the trial court. Aguilar v. Carpenter, 1 Ariz.App. 36, 399 P.2d 124 (1965); Sanchez v. Stremel, 95 Ariz. 392, 391 P.2d 557 (1964).

The remaining assignments of error question the denial of post-trial motions which again raise questions that have heretofore been discussed and as to which we have found no reversible error.

In my opinion, the judgment of the trial court should be modified so as to reduce the judgment to the sum of $60,000, consisting of the principal paid on the contract plus interest thereon from January 31, 1962, the date when the defendant-seller undertook to terminate the contract and retake the subject property by recording the deed recovered back from escrow.

KRUCKER, C. J., having requested that he be relieved from consideration of this matter, Judge WILLIAM C. FREY was called to sit in his stead and participate in the determination of this decision.

HATHAWAY and MOLLOY, Judges (concurring in part and dissenting in part):

The undersigned judges, being the majority of the court on this appeal, concur in the foregoing opinion with the exception of the disposition of the matter of attorney's fees.

■ There is no complaint made on appeal as to the amount of the fees allowed by the lower court but only as to whether the same should be allowed at all. Contracts for payment of attorney's fees are enforced in accordance with the terms of the

---

3. West's Annotated Calif.Codes, Vol. 12, Civil Code, Div. 4, part 1, § 3306, p. 127 (1954).

contract. 25 C.J.S. Damages § 50 c, p. 785; 17 Am.Jur.2d Contracts § 292, p. 707. In our opinion, this was a suit "to enforce or cancel" the subject contract. The buyer being the prevailing party in that suit should recover its reasonable attorney's fees under the provisions of the subject contract. Provisions of this type should be given a reasonably broad meaning and not an exact and restrictive meaning. Leventhal v. Krinsky, 325 Mass. 336, 90 N.E.2d 545, 17 A.L.R.2d 281, 287 (1950).

For the reasons expressed in the opinion of Judge Frey, and those stated herein, the judgment below is modified so as to reduce the judgment to the sum of $72,200, consisting of the following items: $60,000, principal paid on the contract, $4,700 as interest on this amount from January 31, 1962 (the date of retaking of possession by the seller) to May 20, 1963 (the date of judgment in the lower court), and $7,500, the attorney's fees incurred in this action as determined by the lower court. The said judgment of $72,200 is to bear interest from May 20, 1963, the date of the judgment in the lower court.

As so modified, the judgment below is affirmed.